Argued at Pendleton May 4; petitioner disciplined June 15;
rehearing denied July 7, 1937

## In re KITCHEN

(68 P. (2d) 1068)

*C. C. Prebstel,* for Oregon State Bar.

*R. J. Green,* of La Grande (Green & Hess, of La
Grande, on the brief), for Rodney J. Kitchen.

BAILEY, J. The Oregon State Bar on May 20, 1936, filed with the Board of Governors of that organization a complaint against Rodney J. Kitchen, a member of the Oregon State Bar, charging him with unprofessional conduct. The particulars of the charge are thus summarized in the report and recommendations of the trial committee:

"1. That the accused solicited professional employment from one Nora Ordway for the purpose of bringing a civil action against the city of Klamath Falls, Oregon, to recover damages for the death of Harry Ordway, the minor son of Wallace E. Ordway by a mother unnamed.

"2. That the accused intentionally and for the purpose of procuring the said Nora Ordway to give false and perjured testimony in said civil action against the city of Klamath Falls, Oregon, instructed the said Nora Ordway to testify on the witness stand in said trial that the said minor, Harry Ordway, was her true son, although the accused knew at the time that said Harry Ordway was not the son of said Nora Ordway, but was the son of an unnamed mother by Wallace E. Ordway, the husband of Nora Ordway.

"3. That after the failure of accused to prevail in the civil action mentioned he secured passage of an act of Congress which provided for the payment of $4,000.00 to Wallace E. Ordway in his personal right and as administrator of the estate of his minor son, Harry Ordway, and further provided that not to exceed 10% of such sum was to be paid or delivered to or received by any attorney, or agent, on account of services rendered in connection with said claim, and that contrary to the provisions of this act of Congress the accused secured from Wallace E. Ordway and retained as compensation for his services the sum of $2,000.00.

"4. That the accused, well knowing that the minor child Harry Ordway was illegitimate and that the true heir of Harry Ordway was his mother and not

Wallace E. Ordway, the father, or Nora Ordway, wife of Wallace E. Ordway, intentionally and corruptly prepared a false account in the matter of the estate of said Harry Ordway, deceased, and presented it to Wallace E. Ordway, administrator of the estate of Harry Ordway, deceased, with intent and purpose of having the same signed and filed in the county court of Klamath county, Oregon, to be acted upon and approved by said court, and with the intent to deceive and mislead the said court the accused falsely set forth the various items of disbursement in said final account so as to show payment to him of but $400.00 attorney fees instead of $2,000.00 attorney fees.

"That the accused, after the refusal of Wallace E. Ordway to sign said proposed final account, then prepared another similar final account wherein he attempted again to intentionally and falsely mislead the county court of Klamath county, Oregon, but [by] stating that certain administrator's fees in the amount of $800.00 had been paid to Wallace E. Ordway, and that the sum of $2,400.00 had been paid to Mrs. Nora Ordway for the care, labor, nursing, board and clothing of Harry Ordway, the deceased child, when in fact the said accused well knew that he had himself appropriated $2,000.00 from the moneys derived from the act of Congress, and that no such sums had been paid to Wallace E. Ordway as administrator fees, or to Nora Ordway for the care of the deceased child."

■ Rodney J. Kitchen was 62 years of age last December. He was admitted to practice in the state of Indiana in 1900. In 1908 he removed to Oregon and practiced first at Baker, then at Union and finally at La Grande. The evidence is undisputed that his general reputation in the community where he lives, for truth and veracity, is good.

About 1917 Wallace E. Ordway and Nora Ordway were intermarried. Nora Ordway was some four years her husband's senior and had previously been married, of which union there were two children born, both of

whom died prior to 1922, when the Ordways took into their home a child about ten days old, the illegitimate son of Ordway and an unnamed woman. This child was known as Harry Ordway.

On or about September 1, 1927, while the Ordways were temporarily residing at Klamath Falls, Oregon, Harry Ordway was drowned in a United States irrigation project canal, and his body was taken to La Grande for burial. Upon arrival of the Ordways at La Grande and prior to the funeral, Kitchen, according to Mrs. Ordway's testimony, met her on the street and after offering condolences suggested to her that an action be brought for the recovery of damages for the boy's death and that she come in to see him at his office. A few days later, the Ordways, accompanied by Mrs. Ordway's mother, called at Kitchen's office and discussed the advisability of bringing such an action.

There is some evidence to the effect that on this first visit to Kitchen's office the Ordways brought with them a proposed agreement in writing which they had received from an attorney at Klamath Falls for their signature, for the employment of said attorney to handle their claim against the United States, Klamath irrigation district or the city of Klamath Falls. It seems improbable, however, that this document was received by the Ordways until a later date, for the reason that it is dated "the — day of October, 1927," and the Ordways' first visit to the office of Kitchen occurred early in September, only a short time after their return to La Grande.

An agreement was entered into between the Ordways and Kitchen, whereby the latter was employed to act as attorney to handle the Ordways' claim on a contingent basis of 50 per cent. Whether this contract was made on the first visit or at a later date is

not shown by the record, as the copy thereof retained by the Ordways was destroyed by them at the request of Kitchen, and he was unable to locate his copy.

On November 28, 1927, a petition for the administration of the estate of Harry Ordway, deceased, addressed to the county court for Klamath county, was drawn up by Kitchen and signed by Wallace E. Ordway. It was therein stated that the estate had a claim for unliquidated damages and that the only heirs of said decedent were Wallace E. Ordway, his father, and Nora Ordway, his mother. On December 28, 1927, an order was entered by the county court appointing Wallace E. Ordway administrator of said estate, to serve without bond.

An action against the city of Klamath Falls was instituted by the administrator on February 27, 1928, to recover $7,500 for the child's death. The complaint therein was signed by Kitchen and a Klamath Falls attorney as attorneys for the plaintiff.

According to Mrs. Ordway's testimony, she advised Kitchen when he first suggested bringing an action for the death of Harry Ordway that she was not entitled to bring such an action, for the reason that she was not the mother of the deceased child; yet Kitchen, she testified, replied, "Just leave that to me. I will attend to that." She again reminded him of that fact when she consulted him in his office, and he gave a similar answer, she testified. And on the way to Klamath Falls for the trial, she stated, Kitchen said, "Now, if they ask you if you are the mother of the child, say 'yes.'" Ordway testified that he also informed Kitchen at their first meeting and at least one other time before the trial that Harry Ordway was not Mrs. Ordway's child. At the trial Mrs. Ordway did testify that she was the mother of Harry Ordway.

The plaintiff was unsuccessful in that action and thereafter Kitchen, with the knowledge and consent of the Ordways, presented to Congress a claim for the death of Harry Ordway on the ground that the child was accidentally drowned in a canal used in the reclamation service of the United States. After a great deal of effort on the part of Kitchen, an act was passed by Congress, approved May 28, 1934, entitled "An Act for the relief of Wallace E. Ordway," which authorized and directed the treasury of the United States to pay "the sum of $4,000 to Wallace E. Ordway, of Klamath Falls, Oregon, as administrator. Such sum represents compensation to Wallace E. Ordway in his personal right and as administrator for the death of his son, Harry Ordway, who was drowned September 1, 1927, in the United States irrigation canal at Klamath Falls, Oregon". The act further provided that no part of the amount appropriated "in excess of ten per centum thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys, on account of services rendered in connection with said claim," and that it should be unlawful for any agent or attorney to withhold or receive any sum in excess of that percentage.

The government warrant for $4,000 was received by Kitchen a few days before August 18, 1934, and was payable to Wallace E. Ordway as administrator. In the interim between the approval of the act and August 17, 1934, Kitchen had not seen Ordway, but had mailed to the Ordways a copy of the act making the above appropriation. For some time Kitchen did not know the whereabouts of Ordway, but finally learned that he was in Portland. On August 17 Kitchen went to Portland, found Ordway and made arrangements to

take him the next morning to a bank to cash the warrant.

Neither Kitchen nor Ordway was known at any bank in Portland, and Kitchen's daughter, who was employed by a finance company in that city, suggested to her father that she might have one of the superior officers of that company go with Kitchen and Ordway to the bank to identify them. From this point on, there is considerable dispute as to what actually occurred.

The daughter was required to be at work at 8:30 in the morning. She and her father took her automobile, called for Ordway and took him to the business section of Portland. According to Ordway's version of the affair, he and Kitchen first stopped at a downtown hotel, while the daughter went on to work, and at the hotel some question arose as to how much Kitchen was to receive as his compensation for procuring the appropriation by Congress. Ordway's testimony concerning this matter was as follows: "He [Kitchen] says, 'I suppose you are going to live up to your contract,' and I says, 'I suppose we will have to but,' I says, 'What about this other four hundred dollars,' and he says, 'If you think that I will settle this for four hundred dollars, you are crazy.' He says, 'You wouldn't, yourself,' and I says of course I would hate to, but if that was all the law allowed I would have to take it. He says, 'If you think I am going to settle for four hundred, you are crazy.'" Kitchen testified that he did not remember going to any hotel, but was not certain that they did not.

Later, about 10 o'clock in the morning, Ordway and Kitchen proceeded to the office where the latter's daughter was employed, and procured Mr. Burco, the secretary of the finance corporation, to accompany

them to one of the largest banks in Portland, where he introduced them. Mr. Burco testified that the bank official to whom he introduced them "O. K.'d. the check and had Mr. Ordway indorse it before him; and Mr. Kitchen, Mr. Ordway and myself then went to the cashier's window and cashed it. The money was given to me in three one-thousand-dollar bills, two five-hundred bills, and the rest in one-hundred-dollar bills". On cross-examination he testified that the denominations of the currency were three one-thousand-dollar bills, one five-hundred-dollar bill and five one-hundred-dollar bills.

From the bank they returned to the office of the finance corporation and, according to Ordway's testimony, the secretary of that company took him and Kitchen into a private office, laid the $4,000 on the table and said, "Mr. Kitchen, is that all," to which Kitchen replied, "Yes, you can be excused." Kitchen picked up the money, according to Ordway, paid Ordway $2,000 and retained $2,000. Then, according to Ordway, he and Kitchen seated themselves in the outer office and waited until noon, when they and Kitchen's daughter went to lunch, and later all of them attended the horse races at Gresham.

Mr. Burco stated that when he, Kitchen and Ordway reached the company's place of business they went into the president's private office "and Mr. Kitchen asked Mr. Ordway to inform me how to disburse it. Mr. Ordway told me to give Mr. Kitchen four hundred dollars, and he was to get the balance. I gave Kitchen four one-hundred-dollar bills. I then gave Mr. Ordway thirty-six hundred dollars and he took it. Mr. Kitchen brought out a receipt and asked me to read it, and I did, and asked Mr. Ordway to read it. He asked Mr. Ordway to sign it and he signed it in my presence,

and I witnessed it". Burco further testified that Miss Kitchen was present and that Kitchen took from his pocket the receipt which Ordway signed. According to Ordway's version, he received one one-thousand-dollar bill and ten one-hundred-dollar bills.

Miss Kitchen stated as a witness that after the three men returned from the bank they went into the president's office and "as they went in—I wasn't particularly listening to the conversation, but I looked in and stood in the doorway during the transaction and I knew the amount of the check was to be four thousand dollars, and I saw Mr. Burco count out to my dad four hundred dollars, and I saw him give the balance to Mr. Ordway, and then he had brought his receipt with him, and he asked him to sign it, and I saw him sign it, and I saw Mr. Burco sign as a witness, and then they come from Mr. Gram's office, and sat down in an anteroom or outside a railing that divides the office from the reception room, and they were waiting for me, was why they didn't go right out, and I went out with them. I don't remember going to Gresham, but perhaps we did, and then I recall we took Mr. Ordway home". She did not remember going to lunch or dinner with her father and Ordway. No one, she stated, asked her to go into the private office, but she "just wanted to see the transaction". She testified that she read the "receipt" but did not believe that she had it in her hands. It was lying on the table and all three men were in the room when she read it. She did not sign as a witness because she was not asked to do so.

The document referred to as a receipt reads as follows:

"August 18th, 1934.

"This is to certify that I have paid and delivered to R. J. Kitchen the sum of $400.00 or ten per cent of the

amount appropriated as provided in Private Act No. 180, 73rd Congress approved May 28th, 1934. That the said R. J. Kitchen has not asked for, received or demanded any other sum than the said $400.00 and I have not paid him nor any other person for him any amount in excess of said $400.00 for or on account of his services rendered in connection with said claim.

Witness          ''Wallace E. Ordway

H. G. Burco     ''Administrator of the estate of ''Harry Ordway, deceased.''

Kitchen stated that the ''receipt,'' which was typewritten on his office stationery, had been prepared by him before he went to Portland. He then testified as follows:

''Q. Why did you want a receipt or certificate from him that that was what he paid you? A. I wanted to protect myself. Q. Against what? A. Well, I presume just such stuff as is coming up here. Q. Did you anticipate trouble of this character? A. No, I didn't; but I figured that was in the nature of a receipt to me.

\*      \*      \*      \*      \*

''Q. Why did you think it was necessary to state in that receipt that you had not received more than four hundred dollars? A. All I know is just the same as I would get a receipt from you if you paid me twenty-five dollars. Q. You—if you had given him an ordinary receipt for four hundred dollars, wouldn't the same have been true? A. Well, I don't think so. In a common ordinary transaction, but when you are dealing with the government, I think you want protection, is my idea.''

Prior to receiving this money from the federal government Ordway had purchased a ranch near Rochester, some five or six miles from Centralia, Washington. On August 20, 1934, he and Mrs. Ordway opened a postal savings account in the post office at Centralia,

Washington, depositing $1,000 in the name of Nora Ord-way. This is verified by the postmaster of that office. There was a balance of around $1,000 due on the ranch, which was paid off by Ordway about that time, and the name and address of the individual to whom the money was paid were stated with certainty by Ordway.

In the spring or early summer of 1935 the Ordways, according to their testimony, were in financial diffi-culties and were attempting to obtain relief through state or federal agencies. After some assistance had been given them the officials in charge of relief ad-ministration learned that the Ordways had received from the federal government the $4,000 above men-tioned, and further assistance was withheld until a showing was made as to what they had done with the money. Mrs. Ordway, in order to straighten out the matter, went to La Grande, where her mother was still residing, and sought to procure from Kitchen a receipt for the $2,000 which the Ordways claim that he had received out of the $4,000 paid by the govern-ment. According to her story and that of her mother, Mrs. Moon, Kitchen admitted that he had received $2,000 but told them that he could not give a receipt for more than $400, as otherwise he would get into trouble with the government. He finally said that he would give Mrs. Ordway a receipt for $400, but that he could not find it at that time. He promised to deliver it to her later, and in the afternoon of that day he brought to her a typewritten copy of the certificate above quoted.

About this time, Kitchen, his statement indicates, first learned that Mrs. Ordway was not the mother of Harry Ordway, deceased. Under date of August 8, 1935, Mae Dixon made an affidavit before Kitchen as notary public, to the effect that she had known Mrs.

Ordway for some twenty-five years and that more than twenty-five years prior to the date of the affidavit Nora Ordway had undergone a surgical operation which prevented her giving birth to any child; and that after the act of Congress had been passed making the appropriation above referred to, the affiant was talking with Kitchen about some other business, "and in said conversation I informed him that the said child, Harry Ordway, was not the child of Nora and Wallace Ordway and that Nora Ordway had told me about how she got him many times and I knew it was impossible for said Nora Ordway to give birth to a child; this was not known to said R. J. Kitchen at this time, and he was surprised when I told him about said child not belonging to Nora Ordway". At the hearing on the charges herein against Kitchen, Mrs. Dixon stated: "Mr. Kitchen came up and asked me if I knew whether or not that child was Nora's." She further testified that she had heard Mrs. Ordway tell Kitchen over the telephone many times "that the child was her child".

While Mrs. Ordway was at La Grande, attempting to obtain a receipt for $2,000 from Kitchen he prepared for her a claim against the estate of Harry Ordway, deceased, "for care, labor, nursing, board, clothing and expenses of doctoring child Harry Ordway." The amount of the claim was first written in by typewriter as $3,000. Later, the figures 24 were written in ink over the figures 30, both in the claim and in the affidavit. The affidavit as to the correctness of the claim was sworn to before Kitchen on August 21, 1935.

At approximately the same time there was prepared by Kitchen in the Harry Ordway estate a purported final account, which recited the receipt of $4,000 from the United States government. The statement of disbursements listed the following items: attorney's fees

to R. J. Kitchen, $400; administrator's fees, $200; Mrs. Nora Ordway's claim, $3,000; funeral expense, $170; and the balance of the $4,000 was charged off to expenses of the damage action and the probating of the estate. This final account was given by Kitchen to Mrs. Ordway with instructions to send it to her husband, who was then at Rochester, Washington.

When he received the final account, Ordway changed the item of attorney's fees from $400 to $2,000, reduced Mrs. Ordway's claim to $2,400 and apparently changed the administrator's fee from $200 to $800. In attempting to make certain corrections over a lamp, he burned the edge of the paper. The document had been made out to be sworn to before Kitchen, as the date of expiration of his notarial seal was included therein, typewritten.

This paper was returned by Ordway to his wife, who took it to Kitchen, and he advised her that in its mutilated and burned condition it could not be filed. He thereupon prepared a new final account with the same items of expense and same amounts that he had listed in the former document, with the exception that the administrator's fee was noted as $800 and Mrs. Ordway's claim as $2,400. On September 26, 1935, Kitchen sent this final account to Ordway at Rochester, stating in the accompanying letter that he was sending the document to Ordway at the request of the latter's wife. He added:

"She told me to write you again and enclose a new statement or one written over which is practically the same as the one I made out first. You said you would have nothing further to do with the matter and she says for me to tell you to sign this one as it is made out.

"It is important that this estate be closed on your part more than anything else. I believe Mrs. Ordway informed you that it has come to my attention that the child had not been adopted and under the circumstance, it would be impossible for you to hold the money, as it would go to the heirs or escheat to the state of Oregon. This is certain if any one should raise this question before the estate is settled."

The above letter refers to Mrs. Ordway's claim of $2,400, as well as certain other items. As a postscript in Kitchen's handwriting is the following:

"The larger her claim for caring for the child the more you are entitled to and amount you could hold in case any one objected."

This second final account was signed by Ordway without change and returned to his wife, but not delivered to Kitchen.

Mrs. Ordway remained at La Grande for some time and during her stay there Kitchen, according to her testimony, offered to deed to her and her husband 40 acres of land at Pondosa, in order to induce Ordway to sign the final account. This witness says that she checked the records, found that taxes on the land for three years, amounting to about fifteen dollars, had not been paid, and she refused to have anything to do with the land. Kitchen's version of this matter is that Mrs. Ordway had checked the records, found that he owned the above tract of land and then attempted to prevail upon him to convey it to her so that she and her husband could account for part of the $4,000 as having been paid for the land. He told her, however, Kitchen testified, that if he assisted her by that means to "get on relief," he would get himself into trouble.

During the time that Kitchen was having difficulty in persuading Ordway as administrator to sign a final

account he and his daughter drove from Portland to the Ordways' ranch. He gives as a reason for going that he had received from Mrs. Ordway a letter which he was unable to understand and he decided to call upon the Ordways at their home. He was not able to produce the letter at the hearing of charges against him.

Miss Kitchen testified that while she and her father were at the ranch, Ordway requested of her father a receipt for $2,000. She further testified in this connection:

"Q. What did your father say? A. He said he couldn't do it. Q. Did he give any reason? A. I don't recall that he did. Q. And when Mr. Ordway said that he didn't sign the receipt that your father had, neither you nor your father made any reply to it? A. I remember Dad was kind of sitting on the edge of a bench there, and I was standing on the step, and when he made that statement, Dad looked at me and raised his eyebrows, and I didn't say anything. Neither one of us had any comment to make on it."

Kitchen in his testimony thus elaborated upon the account given by his daughter:

"* * * And the first thing I said to her [Mrs. Ordway], is 'What do you mean by writing that letter,' and she said, 'We are not asking you for anything; we want to get on relief, and we want a receipt,' and Ed [Ordway] says, 'I didn't sign it,' and I said, 'Ed Ordway, in the name of God, if you didn't sign that receipt, who did?' And he said well, he didn't sign it. I said 'You don't mean to say that I signed it, do you?'"

At this, he stated, his daughter was shocked "because she had seen him sign it, and he was on his own place and she was scared, from the way he spoke up, and we didn't say much, as she said, because she had seen him sign that receipt, and he acted mad about it,

and she got quite a scare, and she never said a word, or had anything to say, and he started to walk back, and he took her to her car''.

In addition to the evidence already mentioned, attention should be directed to the fact that two bankers were called by counsel for Kitchen as expert witnesses to testify concerning the handwriting on the ''receipt'' said to have been signed by Ordway. These witnesses testified that the writing on the receipt had many of the characteristics of the admitted signature of Ordway on the two final accounts signed by him. One of these witnesses, however, testified that the writing on the ''receipt'' did not have the characteristics of the admitted signatures of Ordway on the petition for appointment as administrator. The other witness testified that he did not know whether the purported signature was traced or not.

There was introduced in evidence the account book of Kitchen with a La Grande bank, covering the period between May 12, 1933, and August 3, 1936, which showed a deposit of $400 on August 23, 1934, and from that date until August 3, 1935, the closing date of the book, all his deposits totaled only $501.31.

The trial committee in its report to the board of bar governors stated that the preponderance of the evidence was insufficient to establish the first three charges of unprofessional conduct hereinabove quoted. This statement, however, was added to its report: ''With respect to charge three as to the accused receiving $2,000 of the appropriation granted by Congress in violation of the Congressional act, the members of the committee feel frank in saying that the entire transaction was very suspicious and the explanation of the accused was not entirely satisfactory,

but the evidence before the committee at the trial did not constitute such a preponderance of the evidence as would warrant the finding that the accused did violate the Congressional act by receiving in excess of $400.'' The committee did find that the charges of unprofessional conduct contained in paragraph 4 above set out were substantiated except as to Kitchen's receipt of $2,000 as an attorney's fee.

The report was filed with the Board of Governors and after some consideration the matter was rereferred to the trial committee and there were introduced at that time depositions of F. M. Sercombe and H. G. Burco. Sercombe's deposition is to the effect that he called Burco on the telephone about July 7, 1936, and made inquiry of him as to what knowledge Burco had of the transaction between Ordway and Kitchen, and Mr. Burco stated that Kitchen and Ordway divided the money and the latter signed a receipt. Burco refused to make any further statement concerning the matter, as he expected to be a witness at the hearing before the trial committee which was to begin four days later at La Grande.

In his deposition Burco recited some of the evidence given by himself prior thereto at the hearing, and stated that he thought he had told Mr. Sercombe how the money was divided, but, if not, he knew that $400 was given to Kitchen and the balance was given to Ordway.

After considering these depositions the trial committee filed another report with the Board of Governors with the same recommendations as previously made. The Board of Governors made findings in accordance with those of the trial committee and recommended that Kitchen be suspended from practice for six months.

Upon a careful consideration of the entire record, we are impelled to the conclusion that Kitchen did in fact retain $2,000 of the $4,000 paid to the administrator of the estate of Harry Ordway, deceased. It is conceded by all the parties concerned that the Ordways made no complaint concerning the retention of this $2,000 by Kitchen. All that they desired was a receipt to show to the relief agencies indicating what had become of the $4,000 paid to Ordway as administrator by the federal government. They fully accounted for the other $2,000 which they admitted receiving. It was only natural for them to ask that Kitchen furnish them the necessary evidence as to disposition of the proceeds of the government warrant.

It will be remembered that from August 18, 1934, until almost a year later the Ordways and Kitchen did not meet and apparently did not communicate. Kitchen did nothing toward going forward with the probate proceedings in Klamath county. He states that he took the so-called "receipt" in order to protect himself against the government and from such charges as are here made, yet he did not proceed in an orderly manner to require the money to be deposited in a bank so that it could not be withdrawn except on order of the court, and he did not require Ordway to give a bond, although he does state that he told Ordway he would have to get a bond, which statement is denied by Ordway. The fact remains, however, that Kitchen did not prepare a bond for Ordway to sign and that no steps were taken to procure one for him. Nor did Kitchen make any attempt during that period to publish notice to creditors or to file a final account.

When Kitchen was confronted with the Ordways' demand for a receipt for $2,000, to present to the relief

agencies, he apparently became apprehensive that an investigation might be made by the federal agencies, which might cause him trouble, and he thereupon sought to have Mrs. Ordway put in a claim for the care and nurture of the child decedent. This was done, according to Kitchen, on the ground that he had just discovered that Mrs. Ordway was not the mother of Harry Ordway. He gives as an explanation for Mrs. Ordway's insistence on having a receipt for $2,000 that when he told her he had discovered that she was not the child's mother she became "absolutely vicious," and that "she is cunning, absolutely cunning and wicked".

Kitchen claims that he was persecuted by members of the trial committee, because they asked him some questions, and that he had made enemies in his district when he ran for election as district attorney in 1936. Neither of these contentions is supported by the record.

In many instances Kitchen was evasive in his answers. He stated that he had received a great many letters from Mrs. Ordway, yet failed to produce more than one of them. Those letters, it would appear, would have furnished some evidence of what Mrs. Ordway was demanding of Kitchen.

Much of the transaction between Kitchen and Ordway as narrated by Kitchen and his witnesses seems highly improbable. We do not see why Burco, a mere stranger to both Kitchen and Ordway, would have taken it upon himself to see how the money was divided between them. Kitchen's daughter knew all the details of what occurred in the private office, yet did not remember whether or not she went to lunch with her father and Ordway or later went to Gresham with them. It appears somewhat unusual, also, that payment of a

$4,000 warrant should have included three one-thousand-dollar bills.

The statement or certificate which is claimed to have been signed by Ordway and which is referred to by Kitchen as a "receipt" evidences a very peculiar procedure. We do not believe that Ordway deliberately perjured himself when he stated that he had not signed it. All his subsequent acts concerning this document are in accord with his belief that he did not sign it.

It is true, Mrs. Ordway testified that she was the mother of Harry Ordway after she claims she had told Kitchen at least twice that she was not the child's mother. She was, however, acting on the advice of her attorney. The contract which Kitchen had was with both Mr. and Mrs. Ordway, and he was exceedingly anxious to have it appear that they were the parents of the child.

■ ■ Chapter 28, Oregon Laws 1935, creating the Oregon State Bar, provides that upon review of any order of recommendation by the Board of Governors the supreme court, after due notice and such hearing as the court may determine, may affirm, modify, or reverse the same and thereupon shall make an appropriate order. The proceedings are in the nature of a trial *de novo* in this court upon the evidence taken before the trial committee. This is not a controversy between individuals but is one in which the state and this court are vitally interested. The mere fact that the Board of Governors does not find that certain charges made against the accused have been established by a preponderance of the evidence does not preclude this court from considering the entire record in the case, regardless of whether or not the Oregon State Bar asks that we review the findings which are not adverse to the accused, as well as those which are unfavorable to him.

The Board of Governors has recommended that Mr. Kitchen be suspended from the practice of law for a period of six months, which recommendation we should be inclined to follow, were it not for the fact that in addition to the board's findings we are of the opinion that the evidence proves that Kitchen did receive and retain the $2,000. In cases of this kind it is sometimes very difficult to determine the proper order to be entered. Mr. Kitchen has practiced law some thirty-six years, twenty-eight years of that time in the state of Oregon. This is the first instance that has come to our attention of his being charged with any professional wrongdoing. His professional business appears to be very limited and we feel that an order suspending him from practice for six months and placing him on probation for two years thereafter will be sufficient to deter him from a repetition of past offenses. It is therefore directed that such an order herein be entered.

BEAN, C. J., and RAND and ROSSMAN, JJ., concur.