Argued and submitted September 7, 1989, accused suspended for 63 days, suspension stayed and accused placed on two-year probation November 26, 1990

In re Complaint as to the Conduct of

# ERIC HAWS,
*Accused.*

(Nos. 86-58, 86-121, 86-125, 86-127, 86-142, 87-9, 87-13 and 87-20; SC S33640)

801 P2d 818

John C. Fisher, Eugene, argued the cause and filed the brief for the accused. With him on the reply brief was David Dickens, Eugene.

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, filed the brief and argued the cause for the Oregon State Bar.

Before Peterson, Chief Justice, and Linde,* Carson, Jones,** Gillette, Van Hoomissen, and Fadeley, Justices.

PER CURIAM

Gillette, J., concurred and filed an opinion in which Peterson, C. J., joined.

---

\* Linde, J., retired January 31, 1990.

\*\* Jones, J., resigned April 30, 1990.

.

## PER CURIAM

In this lawyer discipline case, the accused was charged by a formal complaint of the Oregon State Bar, setting forth 16 causes of complaint involving 21 separate violations of 10 different provisions of the disciplinary rules.[1] After three days of hearing, the Trial Panel found the accused guilty of eight separate violations. The decision of the Trial Panel was that the accused be suspended for 60 days, that such suspension be stayed, and that the accused be placed on probation for two years. The accused sought review in this court.

The alleged violations involve the activity of the accused in respect of seven clients and the failure of the accused to respond fully to inquiries following complaints of misconduct. The Trial Panel found the accused guilty of one act of professional misconduct prejudicial to the administration of justice (DR 1-102(A)(4))[2] and of seven separate failures to respond fully to investigative inquiries (DR 1-103(C)).[3]

Upon the request of the Bar, because of the unavailability of witnesses, two causes of complaint (involving five alleged violations: incompetency, lack of preparation, and neglect of a legal matter)[4] were dismissed at the time of the hearing. In its written Opinion and Disposition, the Trial

---

[1] Before the formal complaint was filed, the State Professional Responsibility Board had petitioned this court for the temporary suspension of the accused during the pendency of the disciplinary proceedings. Rules of Procedure 3.1. The court denied the petition.

[2] DR 1-102(A)(4) provided:

"It is professional misconduct for a lawyer to:

"Engage in conduct that is prejudicial to the administration of justice."

In 1970, DR 1-102(A)(4) originally was adopted by this court as DR 1-102(A)(5). In 1986, DR 1-102 was amended, changing the subparagraph number of this rule from "(5)" to "(4)" but not changing the text. The American Bar Association Model Code of Professional Responsibility, adopted by the ABA in 1969, had an identical provision, numbered DR 1-102(A)(5). An identical provision now can be found in the ABA Model Rules of Professional Conduct, adopted by the ABA in 1983, as Rule 8.4(d).

[3] DR 1-103(C) provided:

"A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

[4] DR 6-101(A)(1), (2), and (3). These provisions are now substantially contained in DR 6-101(A) and (B).

Panel did not find[5] the accused guilty of the remaining eight allegations of violations of the disciplinary rules. The eight allegations concerned seven different disciplinary rules: DR 1-102(A)(4), now, as amended, DR 1-102(A)(3) (engaging in dishonest, fraudulent, deceitful, or misrepresentative conduct), DR 2-101(A)(1) (false and misleading communication), DR 4-101(B)(1) (revealing client's confidence), DR 6-101(A)(3), now, as amended, DR 6-101(B) (neglecting a legal matter), DR 7-101(A)(2) (failing to carry out a contract of employment), DR 7-102(A)(2) (advancing an unwarranted claim), and DR 9-102(B)(3), now, as amended, DR 9-101(B)(3) (failing to render appropriate accounting).

■ Although the Trial Panel concluded that the evidence presented did not establish, by clear and convincing evidence, the guilt of the accused in the foregoing eight allegations of disciplinary rule violations, we consider the matter *de novo* and may adopt, modify, or reject the decision of the Trial Panel. ORS 9.536(3); BR 10.6. In such review, we are free to review the decisions that are favorable to the accused as well as those that are unfavorable. *In re Kitchen,* 157 Or 32, 51, 68 P2d 1068 (1937). However, after such review, we agree with the Trial Panel that there is insufficient evidence of misconduct to find the accused guilty of the eight charges noted.

The accused challenges three aspects of the decision by the Trial Panel. First, he challenges the decision that he engaged in conduct prejudicial to the administration of justice (DR 1-102(A)(4)). Secondly, although the accused does not contest the finding of guilt upon the seven charges of failing to fully and truthfully respond to investigative inquiries (DR 1-103(C)), he does challenge the severity of the sanction of a 60-day suspension from the practice of law. The accused states that a reprimand would be the appropriate sanction. Finally, the accused challenges the conditions of probation imposed during the two-year stay of the suspension.

## DISCIPLINARY RULE VIOLATIONS

*Conduct Prejudicial to the Administration of Justice (DR 1-102(A)(4)).*

---

[5] In its written opinion, the Trial Panel characterized its various conclusions as "the bar did not prove," "the bar failed to prove by clear and convincing evidence," and "the accused did not violate."

The accused, by answer and by his testimony at the hearing, admitted the factual allegations set forth in the formal complaint. Those allegations were that: The accused was retained by the Wilsons (husband and wife) to initiate a bankruptcy proceeding; the Wilsons were required to pay over to the trustee in bankruptcy non-exempt wages in the approximate sum of $214; the Wilsons sent a money order in the prescribed amount to the accused on or about September 30, 1986; the accused then did not forward the payment; on or about October 21, 1986, the trustee requested that non-exempt wages be paid over; the accused did not respond; the trustee, on or about November 19, 1986, made a second request for payment; and the accused then immediately made payment.

The Trial Panel also heard testimony that the Wilsons had made numerous unsuccessful attempts to communicate by telephone with the accused in this matter. The resulting failure of the accused to respond to his clients generated their complaint to the Bar. No matter how unprofessional the failure to communicate properly with his clients may have been, that conduct was not pleaded as a basis of this cause of complaint.

From the foregoing facts, the Bar, acknowledging that the violation "was not one of great magnitude," asserts that there is clear and convincing evidence that the conduct of the accused was prejudicial to the administration of justice. The accused asserts that no funds were distributed by the trustee until more than two months after the accused complied with the second request. Consequently, argues the accused, his delay caused no harm or inconvenience beyond requiring the trustee to send a follow-up letter requesting payment; hence, the accused contends his delayed response in turning over the funds did not cause any prejudice to the administration of justice.

In text, the Disciplinary Rule at issue (DR 1-102(A)(4)) is simple and straightforward: It proscribes "conduct that is prejudicial to the administration of justice." The challenge lies in the application of this rule, a rule that has been criticized for the uncertainty or vagueness of the scope of

the proscription.[6] However, this court has concluded that the terms of DR 1-102(A)(4) are sufficiently definite for the purpose of a disciplinary proceeding and to withstand a claim of unconstitutional vagueness. *In re Roger Rook,* 276 Or 695, 705, 556 P2d 1351 (1976).[7]

In the 19 words that comprise the rule, the key words are but five: "conduct," "prejudicial," and "administration of justice." Further examination of the key or operative words will help:

■ *"Conduct."* Although this word can have several distinct meanings, in the context of the Disciplinary Rule, it refers to the way one acts. It can mean doing something that one should not do. *In re Paauwe,* 294 Or 171, 654 P2d 1117 (1982) (lawyer filed a notice of appeal in a case known to have no merit). It also can mean not doing something that one is supposed to do. *In re Dixson,* 305 Or 83, 750 P2d 157 (1988) (lawyer repeatedly failed to appear for client's deposition). Here, the failure of the accused to forward the wage payment to the bankruptcy trustee was of the latter form of conduct.

■ *"Administration of justice."* The reach of this term is not well defined in our case law or elsewhere. Our previous opinions have assumed that judicial proceedings and matters directly related thereto are within the ambit of the term. This court has found that the rule encompasses conduct such as: The failure to appear at trial, *In re Bridges,* 302 Or 250, 728 P2d 863 (1986); the failure to appear at depositions, *In re Dixson, supra,* 305 Or at 89-90; harassing court personnel, *In re Rochat,* 295 Or 533, 668 P2d 376 (1983); filing an appeal without the consent of the clients, *In re Paauwe, supra,* 294 Or at 177; repeated appearances in court while intoxicated, *In re Dan Dibble,* 257 Or 120, 478 P2d 384 (1970); and permitting a non-lawyer to use a lawyer's name on pleadings, *In re Jones,* 308 Or 306, 779 P2d 1016 (1989).

By recognizing that Bar disciplinary proceedings

---

[6] *See* Weckstein, *Maintaining the Integrity and Competence of the Legal Profession,* 48 Tex L Rev 267, 275-76 (1970); Sutton, *How Vulnerable is the Code of Professional Responsibility?,* 57 NC L Rev 497, 502 n 13 (1979); Comment, *ABA Code of Professional Responsibility: Void for Vagueness?,* 57 NC L Rev 671, 689 (1979).

[7] This decision, in turn, has been criticized. Sutton, *How Vulnerable is the Code of Professional Responsibility?, supra,* n 6.

"strongly resemble judicial proceedings in that they primarily involve factual adjudications," this court, in *In re Boothe,* 303 Or 643, 654, 740 P2d 785 (1987), concluded that the Bar disciplinary proceedings fell within the scope of the administration of justice.[8] Other proceedings that contain the trappings of a judicial proceeding, such as sworn testimony, perjury sanctions, subpoenas, and the like, similarly would qualify as being within the confines of the administration of justice.

■ Two components of the "administration" part of the concept can be identified: 1) The procedural functioning of the proceeding; and 2) the substantive interest of a party in the proceeding. A lawyer's conduct could have a prejudicial effect on either component or both. Moreover, it is the potential effect of the conduct that is reviewed in this segment of the rule. The fact that a lawyer's conduct, viewed after the fact, did not actually affect the administration of justice would be considered under the "prejudice" segment of the rule. *See In re Boothe, supra,* 303 Or at 653 (unsuccessful attempt to induce a witness not to testify nevertheless prejudicial). This line of reasoning, though unstated, may have caused this court to conclude, as it did, that procuring a false notarial certificate falls within the proscribed conduct. *In re Smith,* 292 Or 84, 94, 636 P2d 923 (1981).

■ The conduct of the accused here in failing promptly to respond to the request of the bankruptcy trustee clearly falls within the scope of judicial proceedings and could have affected the procedural functioning of the system or his clients' substantive interests.

■ *"Prejudice."* This is the most problematic term in this disciplinary rule. In context, "prejudice" means "harm" or "injury." That part is easy. The problem arises in fairly determining the amount of harm or injury that triggers application of the rule.[9]

The Bar argues that there is no specific quantum of

---

[8] *Cf. In re Brown,* 298 Or 285, 297, 692 P2d 107 (1984) (absent briefing, argument, and authority, court decides Bar proceeding does not come within the meaning of "administration of justice").

[9] One author has suggested that the rule should be rewritten to forbid conduct involving the obstruction of justice. *See* Sutton, *How Vulnerable is the Code of Professional Responsibility?, supra,* n 6.

harm that must be found before a violation is committed. It is sufficient, according to the Bar, that the delay in forwarding the funds interfered with the orderly processing of the bankruptcy court's business, if only in a limited way. The Bar argues that the fact that no real harm was done should be considered only in arriving at an appropriate sanction. The Bar predicts that "the administration of justice would grind to a halt if no lawyer was accountable under DR 1-102(A)(4) unless he or she pushed judicial officers to the limit of their powers to obtain compliance with legitimate, judicial requests."

In response, the accused claims that the "disciplinary process would likewise grind to a halt if the Bar attempted to discipline even a small fraction of the attorneys who engage in conduct no more aggravated, substantial, or prejudicial than that charged in this count." The Bar and the accused each have a point.

To address the justifiable concerns raised by the Bar and the accused and to reduce the attendant uncertainty in this rule, we choose to interpret the word "prejudice" in the context of this rule to require either:

1. Repeated conduct causing some harm to the administration of justice; *or*

2. A single act causing substantial harm to the administration of justice.

This reading of the disciplinary rule thus recognizes repeated conduct causing some harm (*In re Dan Dibble, supra* (repeated intoxicated appearances in court); *In re Dixson, supra* (repeated failure to appear at client's depositions)) or a single act causing substantial harm (*In re Paauwe, supra* (subjecting clients to liability for costs on unauthorized appeal); *In re Boothe, supra* (witness tampering)).

■ Applying this interpretation to the conduct of the accused, we conclude that there is insufficient evidence for us to find that the conduct in question was repeated (meaning repetitious episodes). Although some harm was caused to the judicial proceeding, the harm was not substantial. Consequently, we find the accused not guilty of a violation of DR 1-102(A)(4).

*Failure to Respond Fully to Investigative Inquiries (DR 1-103(C)).*

The Bar charged the accused with seven separate violations of the disciplinary rule that requires a lawyer, when subject to a disciplinary investigation, to respond fully and truthfully to inquiries and to comply with reasonable requests from the investigating authority. DR 1-103(C). The Trial Panel found the accused guilty of each charge. The accused does not challenge the findings by the Trial Panel of the specific violations, but he does contend that the seriousness of his conduct does not warrant the sanction imposed. The accused has not attempted to justify his conduct by resort to any claim of right or privilege.

Covering a period of conduct from May 1985 to February 1987, written complaints from seven separate clients (or client couples) of the accused were received by the Bar during an eight-month period in late 1986 and early 1987. In each instance, pursuant to the Rules of Procedure (BR 2.5(b)), the Bar wrote to the accused, enclosed a copy of the complaint, and asked for a response. In one case, the accused failed to respond in any manner. Although the accused claimed that he had responded, the Bar did not receive a response and the accused has no record substantiating that he had responded. In the other six cases, his responses took varying forms, usually written on a photocopy of the Bar's letter of inquiry, in terse terms, and, in most instances, signed by a member of his office staff. In five of the cases, the Bar repeated its request for a response by a second letter, but was rebuffed by the accused.

According to his testimony at the hearing, the accused recognized his responsibility to respond to the Bar, noting both an "obligation" and a "duty" to answer the complaints. However, he asserted that he had responded in the "normal fashion" for bankruptcy practitioners and that he had cooperated, "but in his own manner." Although the accused takes the Bar to task in his Reply Brief for arguing "at length" about the inadequacies of his responses to the Bar, a brief review of the accused's "normal fashion" might be instructive to the members of the Bar as a primer of what *not* to do when a complaint is forwarded to a lawyer for response.

In total, the Bar wrote 12 letters to the accused in respect of the seven client complaints. In all but one instance,

the Bar received a response of some sort. Obviously, in the case where the accused failed to respond at all, he violated DR 1-103(C).

■ Of the 10 responses received by the Bar, all but one of them came from an employee of the accused. Only in one case did the accused respond. Both DR 1-103(C) and BR 2.5 require the lawyer to respond, unless, of course, the accused is represented by a lawyer, in which case, a response by the lawyer for the accused is sufficient. A response by a secretary, file clerk, paralegal, family member, or otherwise is not sufficient compliance, whatever may be "normal fashion" for bankruptcy practitioners.

■ The content of the responses was combative (threatening litigation against the Bar, questioning the authority of the Bar to inquire, and asserting that the Bar is encouraging clients to be "bad members of society"), disparaging of clients (client is a "trouble maker"), threatening to clients (will turn matter over for collection if bill unpaid), and, for the most part, unresponsive to the complaints of the clients. Except in the one instance noted, the unprofessional responses were signed by one of three different employees, although the accused acknowledged that he had dictated some of the responses. However, it is not the rude and unprofessional content of the responses that runs afoul of the rule, it is the failure of the accused to respond fully and truthfully.

■ In several of the responses, a request was made to refer the complaint to the "local bar" (presumably, meaning the Local Professional Responsibility Committee). The accused contended that his motivation for stonewalling the inquiries from the Bar was generated by his "feeling that the Bar, and in particular a [now] former employee of the Bar, would not fairly evaluate the charges against him." To his credit, the accused apparently did cooperate with the LPRC's subsequent review of the complaints.

The procedure by which disciplinary complaints are processed is spelled out in the Rules of Procedure (BRs), a series of rules approved by the Board of Governors of the Bar and this court, in accordance with ORS 9.532. The process usually starts with a written complaint to the Bar, which complaint is evaluated by Disciplinary Counsel, and, if the facts stated do not raise an arguable complaint of misconduct,

is dismissed. BR 2.5(a). If, on the other hand, the complaint raises an arguable complaint of misconduct, Disciplinary Counsel mails a copy of the complaint to the accused lawyer and notifies the lawyer that he or she must respond within 21 days. BR 2.5(b)(1). If the lawyer fails to respond, Disciplinary Counsel refers the complaint to the appropriate LPRC for investigation. BR 2.5(b)(2). If the lawyer does respond, Disciplinary Counsel considers both the complaint and the response and may, if the facts alleged do not raise an arguable complaint of misconduct, dismiss the complaint.[10]

The accused does not have the option of short-circuiting the process. The failure to respond cannot be excused by a request for an investigation by a LPRC. *See In re Vaile,* 300 Or 91, 101, 707 P2d 52 (1985) (presentation of evidence to LPRC does not obviate response to Disciplinary Counsel).

A significant number of complaints are resolved at the initial stage of the process. *See, e.g., Report of Executive Director,* Oregon State Bar Annual Report (Disciplinary Matters), p 4 (1989), p 5 (1988), p 4 (1987). Avoidance of this step significantly would increase the correspondence requirement for the Bar (witness this case), markedly would increase the workload of the volunteer lawyers and members of the public serving on the State Professional Responsibility Board, and seriously would overload the volunteer lawyers and members of the public serving on the LPRCs. When a lawyer fails to respond to a client's complaint to the Bar, the whole process is delayed and prejudiced. *In re Hedrick,* 301 Or 750, 761, 725 P2d 343 (1986).

As did the Trial Panel, we find by clear and convincing evidence that the accused is guilty of seven charges of violation of failing fully and truthfully to respond to the written inquires of the Bar. DR 1-103(C).

## CONDITIONS OF PROBATION
## IMPOSED BY TRIAL PANEL

The Trial Panel imposed a 60-day suspension on the accused but stayed the execution of the suspension and placed him on probation for two years. In general, the conditions

---

[10] For a more detailed explanation of the complaint process, *see* Oregon State Bar, *Desk Reference,* ch 6 (1990).

required the accused to receive professional office practice and management counseling (with special emphasis on his docket control and client relations systems), to take successfully the Multistate Professional Responsibility Examination, and to complete a course in stress management. The Trial Panel, in its written opinion, explained its rationale for the particular conditions as follows:

> "In imposing these sanctions we wish to urge that the accused review his case load and availability to meet the needs of his clientele. It is essential that the accused maintain a competent office staff to supervise the details of his practice. It is the impression of the trial panel that the accused has stretched himself beyond his capacity to adequately service his large bankruptcy practice. The accused must give thought to either cutting back upon his case load, or hiring additional staff to give the public the service to which they are entitled. It is our further observation that the accused is suffering from a very heavy work burden causing him a great deal of stress. The stress in turn is causing friction between the accused, his clients, and the Oregon State Bar."

The accused claims that the conditions of probation are ambiguous and not related to the disciplinary rules that the Trial Panel found the accused to have violated. In its brief before this court, the Bar acknowledged that the conditions were imprecise and would be difficult to administer.

■  Upon reviewing the record of the proceeding in this case, involving three days of hearings, including testimony from eight witnesses and introduction of 43 exhibits, it is apparent that the Trial Panel attempted to fashion conditions of probation that would address certain troublesome practices of the accused. Though the actions of the Trial Panel are understandable, perhaps laudable, the Trial Panel's probationary conditions do not track the charges of which they found the accused guilty, and, at least in part, are inappropriate. *See In re Hereford,* 306 Or 69, 76, 756 P2d 30 (1988). The conditions of probation are withdrawn.

## SANCTION TO BE IMPOSED

Since 1986,[11] this court has referred to the Standards for Imposing Lawyer Sanctions (ABA Standards) to assist in determining appropriate sanctions, to the extent that those standards are applicable and persuasive. Those standards consider:

1. *Ethical Duty Violated.* By failing to respond adequately to the Bar, the accused breached a duty owed to the legal profession. ABA Standard 7.0; *In re Arbuckle,* 308 Or 135, 139-41, 775 P2d 832 (1989).

2. *Mental State.* The accused acted with a conscious awareness of the attendant circumstances of his conduct or "knowledge." The accused could not have been unaware that his conduct toward the Bar was other than what was required.

3. *Injury.* The conduct of the accused in failing properly to respond to the Bar caused harm to the legal profession and to the public by delaying the investigation and resolution of the client's complaints.

4a. *Aggravation.* In this case, at least three factors may be considered in aggravation: a pattern of misconduct; multiple offenses (which, in this context, is substantially the same as the first factor); and substantial experience in the practice of law (the accused was admitted in 1973).

4b. *Mitigation.* Absence of a prior disciplinary record and absence of a dishonest or selfish motive are mitigating factors to be considered.

## CONCLUSION

The accused is guilty of seven separate violations of a disciplinary rule. Based on similar findings plus a finding of acts prejudicial to the administration of justice, the Trial Panel imposed a 60-day suspension, but stayed execution of the entire period subject to a two-year probation. On the same factual premise, the Bar calls for a six-month suspension. The accused asserts that a reprimand is sufficient.

The ABA Standards state that a suspension generally is appropriate when the lawyer "knowingly engages in

---

[11] *In re Bristow,* 301 Or 194, 206-08, 721 P2d 437 (1986).

conduct that is a violation of a duty owed to the profession." ABA Standards 7.2. Here, the accused repeatedly engaged in conduct that fell well short of what was required by the disciplinary rule. On the other hand, the accused did make some response and did cooperate with the LPRCs and the Trial Panel. The late-blooming effort to cooperate does not excuse his initial conduct, but it does reduce its seriousness.

Were the infractions of the accused not so aggravated by the persistence of his conduct, a reprimand would suffice. However, because the accused repeated his uncooperative behavior in seven separate instances over an eight-month period, a reprimand would not sufficiently reflect the seriousness of the conduct of the accused. Conversely, the accused, except in one instance, did cause an initial response to be made to the Bar. As noted, the accused did not respond fully—the communications were, in large measure, unresponsive to the complaints of the clients. The truthfulness of the responses was not directly at issue except to the extent that they were incomplete.

As did the Trial Panel, we conclude that a suspension, the execution of which is stayed during a two-year period of probation, is appropriate. Consequently, we suspend the accused for a period of 63 days, stay the execution of the suspension, and place the accused on probation for a period of two years from the date of this appellate judgment. The only condition of the probation is that the accused fully and truthfully comply with the requirements of DR 1-103(C), subject to any claim of right or privilege, during the period of probation.

The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).

**GILLETTE, J.,** concurring.

I join the opinion of the court, but with a reluctance concerning the court's choice of sanction that I wish to set out separately.

The court today imposes a sanction of a 63-day suspension from the practice of law, but then suspends imposition of that sanction and places the accused on two years probation. The net result is that the accused experiences no actual suspension from the practice of law. The court selects this sanction because, although the accused is guilty of seven

different violations of DR 1-103(C) (a lawyer who is the subject of a disciplinary investigation shall respond "fully and truthfully" to inquiries from the Bar), the accused is not found guilty of any violations of other Disciplinary Rules (DRs). The message we send thereby is that it is not so important to respond fully and truthfully to inquiries from the Bar, as long as the lawyer is not guilty of any violations of other DRs in connection with the matter under investigation.

Since its promulgation in January, 1983, this court has never, so far as I can determine, suspended a lawyer solely for violations of DR 1-103(C). In every case, the accused either has had a history of other disciplinary problems, has been found guilty of violating other DRs in the same proceeding, or both factors have been present. The following examples are illustrative: In *In re Chandler,* 306 Or 422, 760 P2d 243 (1988), the accused was suspended for two years, but he had a record of previous disciplinary problems and was found guilty of violating other DRs. The accused in *In re Hereford,* 306 Or 69, 756 P2d 30 (1988), was suspended for 126 days after being found guilty only of violating DR 1-103(C), but he also had a record of prior disciplinary problems and was under suspension both at the time he violated DR 1-103(C) and at the time this court found him guilty of those violations. In *In re Eads,* 303 Or 111, 734 P2d 340 (1987), the accused was disbarred, but he had a prior disciplinary history and was found guilty of violating other DRs. The accused in *In re Vaile,* 300 Or 91, 707 P2d 52 (1985) was suspended for 60 days, but he had violated other DRs in addition to DR 1-103(C). In *In re Dugger,* 299 Or 21, 697 P2d 973 (1985), the accused was suspended for 63 days, but he, too, was found guilty of another charge.

We said in *In re Hereford, supra,* 306 Or at 74, that

"[the] responsibility of a lawyer [under DR 1-103(C)] to 'respond fully and truthfully to inquiries from * * * other authority empowered to investigate [claims of ethical violations]' is not less important than a lawyer's other responsibilities under the disciplinary rules."

In the present case, we have the opportunity to back up that statement by treating the accused the way I suspect we would in a case of any other course of conduct involving seven different violations of the same DR committed over a period of

months in the arrogant manner in which the accused committed them here. In any other such case, I suspect, we would suspend the accused for some period of time. We would better serve the long-term interests of the Bar and the public if we would put teeth in the Bar's investigatory processes by suspending the accused in this case.

My preference notwithstanding, suspension is not the sanction preferred by the majority of the participating members of the court. I see no purpose in dissenting on the matter, but take this opportunity to note that this is the last time that I, at least, shall join in a sanction less than a suspension for violations of DR 1-103(C) of this magnitude. I hope that publication of this opinion will help to put the members of the Bar on notice that their obligations under DR 1-103(C) are no less serious, and the possible consequences to them for failure to abide by that rule no less dire, than those under other DRs.

Peterson, C. J., joins in this concurring opinion.