Argued and submitted April 6, accused suspended for five weeks August 16, 1983

In re: Complaint as to the Conduct of
## WILLIAM C. ROCHAT,
*Accused.*

(No. 82-15, SC 29242)

668 P2d 376

James C. Tait, Oregon City, argued the cause and filed a brief for the Oregon State Bar.

William C. Rochat, Portland, pro se.

Before Lent, Chief Justice, and Peterson, Campbell, Roberts, Carson and Jones, Justices.

PER CURIAM

**PER CURIAM**

The accused is charged with violations of DR 1-102(A)(5) and (6), which provide:

"A lawyer shall not: * * * (5) Engage in conduct that is prejudicial to the administration of justice. (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

The charges arise out of an incident which occurred in the Grand Jury room of the Multnomah County Courthouse and out of a course of conduct involving interaction between the accused and court employees whose duties concerned the appointment of counsel for indigents.

From the record made before the Trial Board, we find the following to be the facts.

The accused was admitted to practice in Oregon in 1973. He is also admitted to practice in Florida. From 1973 to the Fall of 1981, the accused intermittently spent time in both states, engaging in private practice. In the Fall of 1981, he was a sole practitioner in Portland and "signed up" on the list of lawyers seeking court appointments to represent indigents charged with crimes. He had no other clients at that time, although he had some income from another job not related to the practice of law. He had been appointed as counsel and had tried cases prior to the events here in question. At the time of these events, he had appointments for eight pending cases.

## THE GRAND JURY ROOM

The Grand Jury room is located on the seventh floor of the courthouse. Nearby on that floor is the office in which the court appointments clerks work. From time to time the accused came to the seventh floor in connection with his practice of law.

One approaches the Grand Jury room by walking down the main hall of the seventh floor. A door opens off the main hall into a waiting room. Upon or near that door was a sign bearing the legend, "Grand Jury." Across the waiting room is the door to another room in which the Grand Jury conducts its business. That room contains seven desks for the use of the grand jurors and one desk for the use of the district attorney. Both the door from the hall to the waiting room and

the door from the waiting room to the room containing the desks are kept locked when the Grand Jury is not using the space. The key is kept in the offices of the district attorney.

On a morning in October of 1981, the doors were locked until about 8:30 a.m., when a female and a male grand juror entered the space by procuring the key and unlocking the doors. Immediately thereafter, the accused entered the inner room. One of the jurors asked the accused if they could help him, and he responded that he wished to read his newspaper. He sat at one of the Grand Jury desks and commenced to read the newspaper. He made some comments to the jurors concerning the contents of the newspaper.

The accused then asked the jurors whether they thought that the district attorney could get any kind of an indictment he wanted from a grand jury. The male juror responded that he did not believe that he should answer that question. The juror told the accused there was sensitive material in the room and said to the accused, "What if we ask you to leave?" The accused responded, "What if I said 'No'?" The juror said, "Then I would get help."

The accused continued to sit reading his newspaper, and the male juror went for help. He brought back a security officer, who obtained the accused's name and told the accused he would have to leave. At about the same time, the grand juror at whose desk the accused had been sitting came in and stated that the accused was in her chair. The accused then left the room.

During the entire time the grand jurors' notebooks concerning grand jury business were in the room and on their respective desks. One of those notebooks was within the accused's reach at the desk where he sat. He did not inspect the notebook. No grand juror was influenced in the discharge of a juror's duty by the accused's conduct.

■    We start by concluding that the conduct was at least bizarre and was ill advised. We infer a want of good judgment on the part of the accused. The Oregon State Bar has not cited to us any authority holding that conduct of a like nature is "prejudicial to the administration of justice." The accused advanced the proposition that a violation of DR 1-102(A)(5) is neither more nor less than a charge of "unethical" or

"unprofessional" conduct, citing *Board of Medical Examiners v. Mintz,* 233 Or 441, 447, 378 P2d 945, 948 (1963); *In re Reuben G. Lenske,* 269 Or 146, 158, 523 P2d 1262, 1267 (1974); and *In re Roger Rook,* 276 Or 695, 705, 556 P2d 1351, 1357 (1976). Our examination of those cases discloses that they might be interpreted to mean what the accused contends. If so, no profit obtains, for the reasoning is clearly circuitous. The purpose of the disciplinary rules is to identify conduct that is unethical or unprofessional.

We are at a loss to discern how this bizarre, ill advised conduct and want of good judgment equates with the term "prejudicial to the administration of justice."

We hold that it has not been established that the accused violated DR 1-102(A)(5).

The next question is whether the above described conduct of the accused "adversely reflects on his fitness to practice law." We shall assume that the meaning of the words "adversely reflects" are clear enough in the context of this case, for neither the accused nor the Bar contends otherwise. We have been given no assistance by either party as to the meaning of "fitness to practice law." Behavior of the kind exhibited by this accused demonstrates a lack of common sense and good judgment. A lack of a sense of propriety is apparent. It may be that a lawyer who lacks good judgment and a sense of what is fit and proper in certain circumstances will not fare well economically in the practice of law, but we do not believe that is the concept addressed by the disciplinary rule.

By its terms, DR 1-102 is concerned with "misconduct." The Committee of the American Bar Association that promulgated the set of disciplinary rules which served as the model for those adopted in Oregon turned its attention to the term in question in a preliminary draft. The records of the drafters show that the term "adversely reflects on his fitness to practice law" was to be limited to seven specific acts or kinds of conduct:

"As used in Disciplinary Rule 1-102, a lawyer engages in conduct that adversely reflects on his fitness to practice law if he:

"(1)   Makes a materially false statement in connection with his application for admission to the bar.

"(2)   Violates a Disciplinary Rule.

"(3)  Circumvents a Disciplinary Rule through actions of another.

"(4)  Fails to exercise reasonable care to prevent his partners, associates, and employees from engaging in conduct which, if done by him, would violate a Disciplinary Rule.

"(5)  Engages in illegal conduct involving moral turpitude.

"(6)  Persistently engages in any illegal conduct.

"(7)  Engages in other conduct that is degrading to the legal profession."

"Annotated Code of Professional Responsibility," American Bar Foundation (1979), page 12. Eventually in the development of the final product, the provision "degrading to the legal profession" was abandoned as being too vague. The conduct at issue is not encompassed by the specifics set forth. The cases from other jurisdictions noted id. at pages 18 to 22 are not concerned with the kind of conduct which this accused displayed in the Grand Jury room incident.

We hold that the accused is not guilty of a violation of DR 1-102(A)(6) in connection with that incident.

## COURT APPOINTMENTS TO REPRESENT INDIGENTS

The second cause of complaint is that the accused harassed trial court employees in attempts to secure court appointments to represent indigents. We find the facts to be as follows.

The trial court support employees whose duties concerned the appointment of counsel for indigents had their offices on the seventh floor of the courthouse. The accused was on the list of lawyers developed by the trial courts from which appointments were made.

Prior to October 9, 1981, the accused had been appointed from time to time and had discussed with Marie Calvin, a court appointment clerk, on numerous occasions the procedure under which appointments were made by the trial court judges.

On October 9, 1981, Calvin was traversing the main hall of the seventh floor on the way to "felony court" with the docket that had been prepared for the judge who was presiding

over arraignments. Her duty was to deliver the docket and to supply the names of lawyers if needed to supplement appointments of the Metropolitan Public Defender. The accused met her in the hall and asked her why she hadn't any felonies for him. She replied that there were not going to be any appointments of counsel other than the Public Defender at that afternoon's court session. The accused then reached out and crumpled the docket she was carrying, thrust it back at her and "screamed" that she was a liar. The accused then turned and hurried down the hall, continuing to yell that she was a liar.

In October and November of 1981, another court appointment clerk, Susan Wade, had encounters with the accused. He would come to her office two or three times a week and often more than once in a single day. While there, he would pace up and down or sometimes sit and would ask "over and over again" for felony appointments. His voice and tone was such that Wade described it as "sing song" or a chant. He was loud. On one occasion when Wade asked him to leave, he loudly told her that the court was run by the Nazis and that she was a Gestapo. He went off down the hall repeating those allegations in a loud voice.[1]

The repeated visits and demeanor of the accused to Wade's office unnecessarily consumed her working time, and she felt threatened by his behavior. She was apprehensive that he might even strike her. On several occasions she called for security personnel, but the accused had left by the time help arrived. Wade took these problems up with a trial court judge, who told her to keep the accused off the seventh floor with the help of security personnel.

The foregoing conduct of the accused was for the purpose of obtaining appointments as counsel for indigents. The accused's conduct with respect to his interaction with Calvin and with Wade was boorish in the extreme, but the issue is whether that conduct was "prejudicial to the administration of justice" or "adversely reflects on his fitness to practice law" or both.

---

[1] The male grand juror to whom we referred earlier in this opinion heard the accused cursing and using loud, vulgar and obscene language in the hall of the seventh floor, either in connection with one of these encounters with Wade or in connection with an encounter with Calvin.

The effect of the accused's conduct on the clerks' performance of their prescribed duties and the unnecessary consumption of trial court support staff's time were prejudicial to the administration of justice in the sense that it interfered with the orderly processing of the court's business. The bullying attempts to have the clerks place his name on the list of those to whom the judge would look in making appointments for indigents was an improper way of attempting to obtain such appointments and was prejudicial to the administration of justice. Although such conduct is not specifically listed as the kind of conduct meant to be encompassed by the drafters, we find and hold that the accused's improper attempts to obtain appointments adversely reflect upon the fitness of this accused to practice law.

We hold that the accused is guilty of violation of both DR 1-102(A)(5) and (6) with respect to his conduct in attempting to obtain appointments to represent indigents.

We find the appropriate sanction to be suspension. We order that the accused, William C. Rochat, be suspended from the privilege of practicing law for a period of five weeks beginning on the effective date of this decision. *See* Oregon Rules of Appellate Procedure 11.03(4). The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.535(4).