Argued and submitted October 10, 1990, accused suspended July 25 from the practice of law for three years, effective on issuance of the appellate judgment, reconsideration denied September 24, 1991

# In re Complaint as to the Conduct of

# Craig D. WHITE,
*Accused.*

## (OSB 86-25, 87-34; SC S37007)

815 P2d 1257

Christopher Bishop, Portland, argued the cause for the accused. With him on the briefs was Craig D. White, Portland, *pro se.*

Susan K. Roedl, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief on behalf of the Oregon State Bar.

PER CURIAM

## PER CURIAM

The Oregon State Bar charged the accused with violations of several different Disciplinary Rules. The trial panel found him guilty of 11 violations and decided that he should be disbarred. The accused seeks review. We review the record *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing ethical misconduct by clear and convincing evidence. BR 5.2.

The Bar alleges that the accused violated the following standards of professional conduct:

"DR 1-102 Misconduct; Responsibility for Acts of Others.

"(A)   It is professional misconduct for a lawyer to:

"* * * * *

"(2)   Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness to practice law;

"* * * * *

"(4)   Engage in conduct that is prejudicial to the administration of justice."[1]

"DR 2-109 Acceptance of Employment.

"(A)   A lawyer shall not accept employment on behalf of a person if he knows or it is obvious that such person wishes to:

"(1)   Bring a legal action, conduct a defense, or assert a position in litigation, or otherwise have steps taken for the person, merely for the purpose of harassing or maliciously injuring any other person.

"(2)   Present a claim or defense in litigation that is not warranted under existing law, unless it can be supported by good faith argument for an extension, modification, or reversal of existing law."

"DR 7-102 Representing a Client Within the Bounds of the Law.

"(A)   In the lawyer's representation of a client, a lawyer shall not:

---

[1] DR 1-102(A)(4) originally was adopted as DR 1-102(A)(5). In 1986, DR 1-102 was amended, changing the subparagraph number from "(5)" to "(4)." The text of the rule remained the same.

"(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

"(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.

"* * * * *

"(5) Knowingly make a false statement of law or fact."

We conclude that the accused filed unwarranted actions and advanced unwarranted claims merely to harass, in violation of DR 7-102(A)(1) and (2); that he accepted employment knowing that his client intended to bring actions merely to harass and to advance unwarranted claims, in violation of DR 2-109(A)(1) and (2); that the conduct described above — in addition to failures to appear for hearings, failure to follow an order concerning venue, and failures to prosecute claims — prejudiced the administration of justice, in violation of DR 1-102(A)(4); that the accused knowingly made a false statement to a court, in violation of DR 7-102(A)(5); and that the accused committed a criminal act that reflected adversely on his fitness to practice law, in violation of DR 1-102(A)(2). We suspend the accused from the practice of law for three years.

## I. PETTIBON LITIGATION

Most of the alleged violations arose out of the accused's conduct during litigation over the dissolution of a chiropractic partnership. That litigation encompassed 22 cases. The accused represented Pettibon, one of the chiropractors. For ease of reference, we will refer to those cases collectively as the "Pettibon litigation." We also have given each case a case designation (for example, *"Beeson 1"* or *"Pettibon 1"*) using the plaintiff's name and the chronological order of filing by that plaintiff. The Appendix contains a list of the cases and pertinent information about them. When we refer in this opinion to a specific case, we will use the case designation found in the Appendix.

With respect to the Pettibon litigation, the Bar alleges that the accused accepted employment on behalf of a client, Pettibon, who intended to harass the opposing parties with litigation and that the accused filed unwarranted claims with the intent to harass the opposing parties. The Bar also contends that the accused failed to appear at hearings, failed to comply with an order to change venue, and failed to prosecute cases during the Pettibon litigation. The Bar further contends that the behavior of the accused prejudiced the administration of justice.

## A. *Findings and Discussion*

### 1. *Beginning of Litigation*

The accused was admitted to practice law in Oregon in 1981. He is a sole practitioner.

Pettibon and Beeson, two chiropractors, entered into several business partnerships. Their first venture was to establish Willamette View Chiropractic Clinic in Portland. Pettibon kept the financial records and shared the profits with Beeson. Pettibon and Beeson were also business partners in clinics in Hawaii and Oregon City and had similar arrangements with respect to keeping records and sharing profits. In addition, Pettibon and Beeson engaged in a real estate development venture with Lord, a contractor, on undeveloped land in Oregon City. Pettibon, Beeson, and Lord also leased real property in Aloha and formed a corporation, Willamette View Associates (WVA), to manage the construction of an office building on the property. For a short time, Pettibon served as president of WVA.

In April 1983, Lord, Beeson, and WVA filed an action against Pettibon, the first case in the Pettibon litigation *(Beeson 1)*. Lord, Beeson, and WVA sought injunctive relief and an accounting from Pettibon of corporate assets covering his time as president of WVA. In June 1983, Lord and Beeson filed a second action against Pettibon, seeking to have Lord declared a one-third owner of the land in Oregon City *(Beeson 2)*. Pettibon denied that Lord had any ownership interest. Ratoza was the lawyer who represented Beeson in both cases.

## 2. *Intent to File Claims Merely to Harass*

On July 7, 1983, the accused called Ratoza to inform him that, on behalf of Pettibon, the accused had filed an action against Beeson in Clackamas County *(Pettibon 1).* Ratoza asked the accused why he was filing a separate action rather than joining it with the first case, *Beeson 1,* which then was pending in Multnomah County. According to Ratoza, the accused replied that Pettibon intended "to sue Dr. Beeson in as many different courts for as many different claims as they could think up." The accused told Ratoza that Beeson had hurt Pettibon and that Pettibon was going to get even by causing Beeson "as much grief and expense * * * as was humanly possible." The accused also intimated that Pettibon enjoyed litigation. The accused denied that he made those statements to Ratoza.

In addition to offering Ratoza's testimony at the disciplinary hearing, the Bar introduced Ratoza's contemporaneous handwritten notes and his affidavit about the conversation, which was prepared about seven months after the conversation took place. After hearing the testimony of both Ratoza and the accused, the trial panel found that Ratoza was credible. The accused admits that Ratoza was a credible witness but asserts that Ratoza was impeached, because he admitted that his notes were not a verbatim account of the accused's statements. Ratoza testified, however, that the notes accurately conveyed the substance of the accused's statements.

We find that the accused did not testify truthfully in this proceeding when he denied making the statements to Ratoza. We find in accordance with Ratoza's testimony. In July of 1983, the accused intended to bring legal actions on Pettibon's behalf merely for the purpose of harassing Beeson.

After the conversation with Ratoza, in a period of five years, the accused filed 14 more cases on Pettibon's behalf — in Clackamas, Multnomah, and Washington Counties; in Clark County, Washington; in the United States District Court in Portland, Oregon; and in federal bankruptcy court. Beeson was an opposing party in all but one of those cases. We turn to an examination of several specific actions.

### 3. *Duplicate Claims Concerning Note*

In the first case *(Beeson 1)*, the accused filed a counterclaim on behalf of Pettibon against Lord, Beeson, and WVA, seeking to collect on a note for $25,750. The jury determined that the note was not a debt of either the corporation or the partnership, because it had been a capital contribution, rather than a loan. Yet, less than one year later, the accused, on Pettibon's behalf, sued the same parties on the same note in a different county *(Pettibon 13)*. The complaint in that action alleged that the note was due, despite the earlier jury determination that the note actually was a capital contribution. The trial court dismissed the claim in *Pettibon 13* on the ground that it was barred by principles of claim preclusion.

The accused argues that, in *Pettibon 13*, his client was not pursuing the same claim as in *Beeson 1*. He says that he simply pleaded the note, because he was seeking a partnership accounting and wanted it included as a capital contribution. The complaint alleges, however, that Pettibon *loaned* the money to defendants and was entitled to repayment. The claim concerning the note in *Pettibon 13* was unwarranted in law and in fact, and the accused knew it. The accused filed that claim merely to harass Beeson and Lord.

### 4. *Bankruptcy Proceedings*

The accused, on Pettibon's behalf, sought to have WVA involuntarily declared bankrupt *(Pettibon 3)* a few days before the scheduled trial on the accounting of assets *(Beeson 1)* and five days after the circuit court had denied the accused's motion for a postponement in *Beeson 1*. After filing the involuntary bankruptcy petition, the accused again sought a postponement in *Beeson 1*, based on the automatic stay provision of the federal bankruptcy laws. 11 USC § 362 (1983). The circuit court again denied the postponement, on the ground that the automatic stay applies only to actions *against* the debtor, not to actions *by* the debtor. The circuit court had already severed the counterclaims against WVA in *Beeson 1* for the purposes of the trial.

Although the scheduled trial in the circuit court did not involve an action against the debtor, the accused argued in the bankruptcy court for a contempt order against Beeson

and Lord for proceeding with the case in circuit court in violation of the automatic stay. The bankruptcy court found that Pettibon had pursued the contempt motion in bad faith: "the motion was interposed to harass [Beeson and Lord] and to delay the pending actions in state court." The court denied the motion and imposed sanctions against Pettibon. The court also dismissed the involuntary bankruptcy petition, although it specifically found that the petitioner had not filed the petition in bad faith.

The accused claims that he did not decide that Pettibon should file the case in bankruptcy court, but instead relied entirely on a bankruptcy law specialist. The accused did not sign the contempt motion. He was, however, designated on the motion as "Trial Attorney for Petitioner." He also argued the contempt motion to the bankruptcy court. We find that the accused participated in the bankruptcy proceedings, including the contempt motion. We are not convinced that the bankruptcy petition itself was unwarranted. We do find, however, that the accused participated in pursuing a contempt motion in *Pettibon 3* that he knew was unwarranted in law and in fact and that he pursued the contempt motion merely to harass Beeson and Lord.

5. *Shareholder's Derivative Action and Action for Fraud*

The accused filed a shareholder's derivative action against Beeson and Lord, on Pettibon's behalf, alleging fraud in the development of the Aloha property *(Pettibon 6)*. While that case was pending, the accused filed yet another action against Beeson, alleging fraud and breach of fiduciary duty in the development of the same property *(Pettibon 11)*. After filing *Pettibon 11,* the accused did not prosecute it. It was dismissed for want of prosecution 10 months after filing.

The accused argues that a shareholder's derivative action is not an action directly against Beeson. Although technically correct, that argument does not absolve the accused in the circumstances here. The complaints contained substantially similar allegations. There were only three shareholders of WVA: Beeson, Lord, and Pettibon. In *Pettibon 6,* Pettibon was suing Beeson and Lord — the only other shareholders. Pettibon was the only shareholder who stood to

benefit from that action. Thus, the claims in his direct action *(Pettibon 11)* and his derivative action *(Pettibon 6)* were substantially the same. The second of those two actions, *Pettibon 11,* was duplicative and, therefore, unwarranted in law and in fact, and the accused knew it. The accused filed *Pettibon 11* merely to harass Beeson.

### 6. *Change of Venue*

On Pettibon's behalf, the accused filed two actions in Washington County against Beeson and Lord *(Pettibon 6* and *Pettibon 7).* Beeson's new lawyer, Lundeen, filed a motion to change venue to Multnomah County in both cases. The court granted the motion and ordered the accused to change venue within 10 days. The accused failed to change venue in either case. Instead, he filed two new cases in Multnomah County, *Pettibon 8* and *Pettibon 12,* and left *Pettibon 6* pending in Washington County.[2] About six months later, the court dismissed *Pettibon 12* for want of prosecution. The accused obtained an order of reinstatement, but the court dismissed the case again after the accused failed to respond to ORCP 21 motions. The court dismissed *Pettibon 8* for failures to appear at court appointments and failure to prosecute the case.

The accused asserts that he did not intend to harass the opposing parties. Rather, he claims, he could not locate any statute or rule that explained the procedure to change venue. The record shows otherwise. The motion to change venue cited ORS 14.030 *et seq.,* which details how to change venue. The accused also testified that he researched the venue statutes whenever he filed an action. Finally, according to the Washington County Court Clerk's notes, the accused refused to pay the fee for changing venue.

We find that the accused knew how to change venue and knew that maintaining two actions *(Pettibon 6* and *Pettibon 12),* instead of transferring the first of them *(Pettibon 6)* was not warranted. The accused continued to maintain two actions, instead of changing venue, merely to harass Beeson and Lord. We also find that the accused did not testify

---

[2] The parties voluntarily dismissed *Pettibon 7* shortly after the trial court granted the motion to change venue. In *Pettibon 6,* there was no order of dismissal entered, except for an order dismissing Lord, which was entered about 16 months after the trial court granted the motion to change venue.

truthfully in this proceeding when he denied knowing how to change venue.

### 7. *Failures to Appear*

As he admitted, the accused failed to appear at six hearings over the course of the Pettibon litigation. Two of those failures to appear were in "Rule 4" hearings[3] *(Pettibon 5* and *Pettibon 8).* Two of the hearings were on ORCP 21 motions *(Bank 2* and *Pettibon 5).* As to those four hearings, the accused admitted that he could offer no explanation for failing to appear.

The accused provided explanations for why he missed two hearings. One concerned a discovery motion in *Bank 2.* The accused requested that hearing. He testified that he had a conflicting trial date and that he had tried to have another lawyer appear in his place, but that the day before the hearing that lawyer had informed the accused that he could not appear. The accused did not inform the court or the opposing parties, however, that he would be unable to appear. The accused's explanation, assuming its accuracy, is inadequate to justify his failure to notify the court and opposing counsel of his inability to appear.

The other hearing that the accused missed, for which he provided an explanation, was a conference in Multnomah County Circuit Court scheduled by Beeson's lawyer in *Pettibon 8.* The accused testified that he did not receive notice of the conference until after it had occurred. We find his explanation plausible, because Beeson's lawyer sent notice of the conference very close to the date that it occurred. The Bar has not proved by clear and convincing evidence that the accused intentionally failed to appear at that conference.

### 8. *Attorney's Lien*

Pettibon eventually dismissed the accused as his counsel, after which Pettibon and Beeson concluded a comprehensive settlement. Soon thereafter, the accused filed an

---

[3] Senior Judge Charles S. Crookham, who had been a presiding judge in Multnomah County Circuit Court, testified that the court conducted "Rule 4" hearings to determine the status of pending cases that were not at issue. "Rule 4" referred to the number of the local rule.

attorney's lien on the Aloha property. The lien clouded Beeson's title and compromised his ability to apply for a bank loan to pay Pettibon the amount agreed to in the settlement.

The accused's filing of an attorney's lien did not violate the standards of professional conduct. He had a legal right to file the attorney's lien. The Bar does not contend otherwise. The evidence does not show clearly and convincingly that the accused filed the lien merely to harass. The fact that it may have impeded payment of the settlement does not, in and of itself, make filing an otherwise permissible attorney's lien a violation of any Disciplinary Rule.

### 9. *Effect on Court Docket*

The accused filed 15 separate actions in several different courts — including the Circuit Courts for Multnomah, Washington, and Clackamas Counties — in the Pettibon litigation. Senior Judge Charles S. Crookham testified that, in his opinion, the accused should have filed all but two of the claims *(Pettibon 3* and *Beeson 2)* in Multnomah County. Had the accused done so, Judge Crookham testified, 12 of the cases could have been consolidated for trial: *Pettibon 1, 2, 4, 5, 6, 7, and 8; Grabhorn 1;*[4] and *Pettibon 10, 11, 14, and 15.* We find in accordance with Judge Crookham's testimony, subject to the correction made in note 4. We also have found, above, that some of the actions were repetitive and unwarranted. The conduct of the accused burdened the dockets of the Multnomah, Washington, and Clackamas County Circuit Courts.

### B. *Disciplinary Rules Violated*

We conclude that the accused violated the following Disciplinary Rules in the course of the Pettibon litigation discussed above:

### 1. *DR 1-102(A)(4).*

The accused engaged in conduct prejudicial to the administration of justice by: filing repetitious claims *(Beeson 1/Pettibon 13* and *Pettibon 6/Pettibon 11);* filing claims in different counties when that was not warranted *(Pettibon 6,*

---

[4] Judge Crookham appears to have meant *Pettibon 9,* rather than *Grabhorn 1,* because he stated that all the cases that he listed were brought by Pettibon as plaintiff. We find that Judge Crookham misspoke and that he meant to include *Pettibon 9* rather than *Grabhorn 1.*

*Pettibon 7);* failing to change venue *(Pettibon 6, Pettibon 7);* failing to appear at hearings *(Pettibon 5, Pettibon 8, Bank 2);* and failing to prosecute cases *(Pettibon 8, Pettibon 11, Pettibon 12). See In re Rochat,* 295 Or 533, 668 P2d 376 (1983) (holding that a lawyer who harassed court personnel to secure court appointments unnecessarily consumed court time in violation of DR 1-102(A)(4)); *In re Haws,* 310 Or 741, 748, 801 P2d 818 (1990) (holding that a repeated pattern of conduct that caused some harm to the administration of justice violated DR 1-102(A)(4)).

### 2. *DR 2-109(A)(1).*

The accused accepted employment from Pettibon knowing that Pettibon intended to use litigation as a tool to harass Beeson.

### 3. *DR 2-109(A)(2).*

The accused accepted employment from Pettibon knowing that Pettibon intended to pursue unwarranted claims against Beeson.

### 4. *DR 7-102(A)(1).*

a. The accused filed claims in *Pettibon 3, 11, and 13* merely to harass Beeson and, except in *Pettibon 11,* merely to harass Lord.

b. The accused filed claims in different counties when that was not warranted, merely to harass Beeson and Lord *(Pettibon 6* and *Pettibon 7).*

### 5. *DR 7-102(A)(2).*

The accused knowingly advanced unwarranted claims in:

a. *Pettibon 13* by alleging that a note was due, despite an earlier jury determination that it was not.

b. *Pettibon 3* by participating in pursuing an unwarranted contempt motion in bankruptcy court.

c. *Pettibon 11* by filing a direct action against Beeson that was substantially the same as a pending derivative action in *Pettibon 6.*

## II.  ALLEGEDLY FALSE STATEMENTS

### A.  *Trial Court*

The Bar contends that the accused violated DR 7-102(A)(5) during the Pettibon litigation, by making a false statement to the trial court. The Bar contends that the accused knowingly misrepresented the age of one case and the nature of two proceedings in order to obtain postponement of a trial.

On February 17, 1984, the accused sought a postponement in the second case filed against Pettibon by Beeson and Lord *(Beeson 2)*. His affidavit in support of the request contained these statements:

> "I have two conflicting cases now pending in Multnomah County which conflict with the time now set for trial in this case. The first is Multnomah County Circuit Court No. 8306-04131 which was first filed on or about March 23, 1984 [*sic*][5]... Both of the cases which are in time conflict with the trial date in this case have been pending for longer than this case."

The accused had in fact filed Case No. 8306-04131 about one month *after* the case in which he was seeking a postponement. His statement that Case No. 8306-04131 was older was, therefore, false.

The Bar further contends that, by using the words "conflicting cases," the accused knowingly suggested that the conflict was with a pending trial date. In fact, the only conflict was with a Rule 4 hearing. The accused argues that the word "cases" is broad enough to fit both types of proceedings and that he interpreted it broadly.

We find that the accused intended that "cases" be understood by the court to mean "trials" or, at least, significant proceedings. His argument to the contrary does not comport with his testimony at the disciplinary hearing. There, the accused stated that Rule 4 hearings were relatively insignificant, so that missing them was inconsequential. He

---

[5] The accused misstated the filing date of Case No. 8306-04131. He filed it on June 29, 1983, not March 23, 1984. The Bar concedes that his misstatement of the filing date was inadvertent. Case No. 8306-04131 was not part of the Pettibon litigation.

said that he often did not appear for oral argument in Rule 4 hearings. He further testified that "[a] trial is more important than any kind of motion."

In addition, the accused testified that opposing counsel informed the court in oral argument that the conflict was with a Rule 4 motion. He appears to contend that he is absolved from responsibility for his false statement, because opposing counsel clarified what the conflict was. We disagree. DR 7-102(A)(5) prohibits a lawyer from knowingly making a false statement to the court. Whether the court is misled by the false statement is irrelevant. The accused knowingly made a false statement to the trial court in *Beeson 2* in order to obtain a postponement, in violation of DR 7-102(A)(5).

## B. *Court of Appeals*

The Bar alleges that the accused also made a false statement to the Court of Appeals. The accused wrote the following in a motion to consolidate two appeals:

> "*The parties are the same in both pending cases on appeal.* Burl R. Pettibon is the Plaintiff-Appellant in both cases, No. A41110 [*Pettibon 12*] and No. A42199 [consolidated appeal of *Beeson 2* and *Pettibon 13*]. Both Steven G. Lord and Daniel E. Beeson are named Defendant-Respondents in both cases. *Each of the three individuals are co-equal 1/3 owners of the outstanding stock of [WVA].*" (Emphasis added.)

The Court of Appeals denied the motion to consolidate.

The parties were not the same in both of the cases pending on appeal. The Court of Appeals had dismissed Lord from one of the appeals more than 11 months before the accused filed the motion to consolidate. The accused had signed the stipulation providing for Lord's dismissal from the case. In addition, when the motion for consolidation was filed, Pettibon no longer owned one-third of the outstanding stock of WVA. He had sold it to Lord as part of a settlement agreement.

The accused contends that he did not *knowingly* make false statements in the motion to consolidate. The motion states that the court had dismissed Lord as a party, pursuant to a settlement agreement. The motion further states, however, that Pettibon was challenging the validity of

the settlement agreement. In his brief to the Court of Appeals in case No. A42199, the accused did in fact claim that Pettibon was "forced" to sign the agreement under threat of contempt by the trial judge. Because the motion on its face disclosed the basis for the conclusory statements quoted above, the accused does not appear to have misled the Court of Appeals knowingly. The Bar has not proved by clear and convincing evidence that the accused made a statement to the Court of Appeals knowing that it was false.

## III. ASSAULT AND ASSAULT LITIGATION

The Bar's last cause of complaint involves the accused's assault of a police officer. On December 16, 1983, the accused became intoxicated at a Christmas party. He was arrested later that evening for driving while under the influence of intoxicants. Officer Hostetler was dispatched to the scene to assist the arresting officer. When Hostetler arrived, the accused was seated in the back of the arresting officer's patrol car. Hostetler started to impound the accused's car and check for damage to and ownership of another car that the accused's car had hit. The arresting officer called for help. The accused had rolled over onto his back and was kicking the driver's side passenger window of the patrol car, hard and repeatedly. Hostetler opened the door, grabbed the accused's feet, and pulled him upright by the coat. The accused responded by saying, "What you jerks need is civil litigation." Hostetler closed the door and walked away, but the accused again rolled over and began to kick the window. Hostetler returned and opened the door. The accused yelled, "I'll kick the shit out of you," and kicked Hostetler in the face with the side of his right shoe. Hostetler suffered a loose tooth, a bruised and swollen upper lip, and a stiff neck as a result of the kick. The accused was charged with a misdemeanor for the assault, was convicted, and received a seven-day jail sentence.[6]

Hostetler filed a civil action against the accused to recover for damages that he sustained from the assault. The accused responded with a counterclaim for battery. The case

---

[6] The accused testified that he did not form any culpable intent. *See* ORS 161.125 (voluntary intoxication can "negative an element of the crime charged"). The jury at his trial for assault found to the contrary, and so do we.

was assigned to arbitration. The arbitrator ordered the accused to produce his tax records, in connection with the claim for punitive damages, and a videotape of his deposition. The arbitrator testified at the disciplinary hearing that the accused did not produce either the tax records or the videotape. The arbitrator dismissed the accused's counterclaim as frivolous and awarded the police officer $14,000, of which $12,500 was for punitive damages. The arbitrator found that "the accused has treated the judicial procedures, both criminal and civil, in this matter as totally facetious with total contempt of any responsibility or obligation therein."

The Bar alleges that the accused violated two Disciplinary Rules in connection with those incidents. First, by assaulting a police officer, he committed a criminal act adversely reflecting on his fitness to practice law, in violation of DR 1-102(A)(2). Second, by failing to produce documents and displaying contempt for the arbitration process, the accused interfered with the arbitration process and prejudiced the administration of justice, in violation of DR 1-102(A)(4). We consider the assault first.

DR 1-102(A)(2) provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law." Most cases arising under that rule concern criminal acts that show fraud or dishonesty. *See, e.g., In re Hendricks,* 306 Or 574, 761 P2d 519 (1988) (violation of federal tax law). The criminal act in this case does not show fraud or dishonesty. This court has not been called on previously to examine whether a misdemeanor assault can be a criminal act that reflects adversely on a lawyer's fitness to practice law. This court has held, however, that a lawyer can violate DR 1-102(A)(2) without having committed an act of fraud or dishonesty and without having engaged in the specific kinds of conduct envisioned by the drafters of the American Bar Association's parallel model rule. *In re Rochat, supra,* 295 Or at 537-40 (the accused's "bullying attempts" to have court clerks place his name on list for indigent appointments adversely reflected on his fitness to practice law, in violation of DR 1-102(A)(2)).

We agree with the American Bar Association Standards for Imposing Lawyer Sanctions, Commentary to § 5.0 (1986) (ABA Standards), when they state:

> "The most fundamental duty which a lawyer owes the public is the duty to maintain the standards of personal integrity upon which the community relies. The public expects the lawyer to be honest and to abide by the law; public confidence in the integrity of officers of the court is undermined when lawyers engage in illegal conduct * * *."

Oregon law echoes a similar theme. ORS 9.250 provides in part:

> "If an applicant for admission as an attorney is found qualified, the court shall administer an oath to the applicant, that in the practice of law the applicant will support the Constitution and laws of the United States and of this state, and be of faithful and honest demeanor in office."[7]

Accordingly, in the oath that the accused took, he promised to "support the Constitution and laws of the United States and of the State of Oregon."

To some extent, every criminal act shows lack of support for our laws and diminishes public confidence in lawyers, thereby reflecting adversely on a lawyer's fitness to practice. DR 1-102(A)(2) does not sweep so broadly, however. For example, a misdemeanor assault arising from a private dispute would not, in and of itself, violate that rule. *See In re Johnson,* 106 Ariz 73, 74, 471 P2d 269 (1970) (holding that a lawyer who had been charged with assault did not violate the parallel Arizona disciplinary rule; incident was isolated, not involving a fixed pattern of misbehavior, and did not involve moral turpitude). Each case must be decided on its own facts. There must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law. Pertinent considerations include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct.

---

[7] *See also* ORS 9.220(2)(b) (applicant for admission as attorney may lack "good moral character" if conduct would cause a reasonable person to have substantial doubts about applicant's respect for the rights of others and for the laws of the state).

■    In the present case, the Bar does not claim that the accused's driving under the influence of intoxicants was a criminal act that reflected adversely on his fitness to practice law within the contemplation of DR 1-102(A)(2). The accused did more than that, however, when he tried doggedly to obstruct his detention following the arrest and assaulted Hostetler in the process. Among the most important components of support for the law are nonviolent resolution of disputes and respect for those who enforce the law. More specifically, Oregon law is clear that any dispute over the legality of police action must be settled in court and not by resort to violence. *See* ORS 161.260 (person may not use physical force to resist an arrest by peace officer, whether arrest is lawful or unlawful); ORS 163.208 (defining crime of assaulting a public safety officer); *State v. Wright,* 310 Or 430, 799 P2d 642 (1990) (holding that, if a police officer uses excessive force in making an arrest, the arrestee may use only such physical force as is reasonably necessary under the circumstances for self-defense against the excessive force). The accused's assault of a police officer, although only a single misdemeanor, demonstrated a profound disregard for the process of peaceful dispute resolution, as well as for those whose task it is to facilitate that process. His criminal act also caused physical injury to the officer. The accused's criminal act reflects adversely on his fitness to practice law. He violated DR 1-102(A)(2).

We turn to the Bar's second allegation — that the accused prejudiced the administration of justice by failing to produce documents and a videotape as ordered during arbitration. The accused contends that the Bar did not present clear and convincing evidence that the requested items were not produced. The accused admits only that he did not produce a "schedule" to his tax return. As to that item, the accused testified that the requested schedule did not exist.

With respect to the order to produce, the arbitrator testified:

"Q.  Did [the accused] comply with the order?

"A.  My recollection is he did not.

"Q.  In particular, with the videotape, what did he tell you about that?

"A.   My recollection is that he said he had lost the tape or it had been misplaced."

That testimony is not sufficient to meet the Bar's burden of proof. The Bar has not proved by clear and convincing evidence that the accused intentionally failed to obey the order to produce documents and a videotape during arbitration.

## IV.   SANCTION

We have found the accused guilty of several violations of the Disciplinary Rules: DR 1-102(A)(2) and (4); DR 2-109(A)(1) and (2); and DR 7-102(A)(1), (2), and (5). We turn now to the task of deciding what sanction his actions warrant. We refer for assistance to the ABA Standards. *See In re Bristow*, 301 Or 194, 206-08, 721 P2d 437 (1986) (looking to ABA Standards for guidance). The ABA Standards set out the factors to consider generally in imposing sanctions, in Standard 3.0:

"(a)   the duty violated;

"(b)   the lawyer's mental state;

"(c)   the potential or actual injury caused by the lawyer's misconduct; and

"(d)   the existence of aggravating or mitigating factors."

The accused violated his duty to the legal system during the course of the Pettibon litigation, and he did so intentionally and repeatedly. He abused the legal system by filing a multitude of vexatious actions on behalf of his client. He intentionally used the legal system as a tool to harass, rather than to resolve his client's legitimate disputes. He knowingly made a false statement to the trial court. His conduct wasted a great deal of time and money for the courts, lawyers, and litigants involved.

Despite our conclusion that the accused also violated DR 1-102(A)(2) by assaulting a police officer, that violation plays no role in our assessment of the appropriate sanction, for two reasons. First, there was a lengthy delay in pursuing the violation. The accused's act occurred in 1983, but the Bar did not hold a hearing concerning it until 1989. *See* ABA Standard 9.32(i) (delay in disciplinary proceeding is mitigating factor). Second, the conduct was isolated. The record shows no repetition of criminal conduct by the accused,

indicating his rehabilitation in the interim. *See* ABA Standard 9.32(j) (interim rehabilitation is mitigating factor).

The ABA Standards provide some guidance on the appropriate sanction for the accused's conduct during the Pettibon litigation:

"6.1   False Statements, Fraud, and Misrepresentation

"Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:

"* * * * *

"6.12   Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court * * *, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

"6.2   Abuse of the Legal Process

"Absent aggravating or mitigating circumstances, * * * the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists:

"* * * * *

"6.22   Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding."

In the absence of aggravating or mitigating circumstances, the accused's conduct justifies a suspension. There are four aggravating circumstances: The accused is guilty of multiple offenses, he has been disciplined previously (albeit for a different kind of conduct),[8] he testified falsely during the

---

[8] *In re Craig White,* 1 DB Rptr 174 (1986) (accused received a public reprimand for having accepted a clearly excessive fee).

disciplinary process, and he does not acknowledge the wrongful nature of his conduct. *See* ABA Standard 9.22(a), (f), and (g) (aggravating factors). Arguably, the accused was inexperienced in the practice of law at the time the events described in this opinion began, and his prior discipline was remote. *See* ABA Standard 9.32(f) and (m) (mitigating factors). Even if those are mitigating circumstances, the aggravating circumstances outweigh them.

The accused is guilty of numerous violations of the Disciplinary Rules. He engaged in a pattern of inappropriate conduct over a period of five years. That pattern of conduct, coupled with the accused's lack of candor, suggests that disbarment, or a substantial period of suspension, is needed in order to impress on the accused the necessity of complying with the Disciplinary Rules. The appropriate sanction is a three-year suspension.

The accused is suspended from the practice of law for a period of three years, effective on issuance of the appellate judgment.

## APPENDIX

### INDEX OF CASES

| CASE DESIGNATION | CASE NAME, NUMBER, VENUE & FILING DATE | SUMMARY OF CASE |
|---|---|---|
| Beeson 1* | *Lord, Beeson, & WVA, Inc. v. Pettibon* A8304-02497 (Multnomah) 4-20-83 | An action by WVA, Inc., Lord, and Beeson, seeking an accounting from Pettibon of corporate assets during his tenure as corporation president from Oct. 1982 to Apr. 20, 1983, and seeking injunctive relief. |
| Beeson 2* | *Lord & Beeson v. Pettibon* 83-6-27 (Clackamas) 6-1-83 | Lord and Beeson sue Pettibon to have Lord declared owner of a 1/3 interest in Oregon City real property and to require Pettibon to execute and record the necessary documents. |
| Pettibon 1 | *Pettibon v. Beeson & Smith* 83-6-469 (Clackamas) 6-28-83 | *Pettibon sues Beeson and* Smith on a $25,750 note due from the Pettibon/ Beeson/Smith partnership, for an accounting for the obligation to satisfy the amount advanced to partnership, for breach of contract, and for partition of real property and distribution of partnership assets. |
| Pettibon 2 | *Pettibon v. Beeson* 83-2-02043-7 (Clark) | Pettibon sues Beeson on a $218,769 promissory note executed on or |

---

* Pettibon filed counterclaims.

| | | 10-4-83 | about 12-31-80 and for $15,000 in attorney fees. |
|---|---|---|---|
| Pettibon 3 | *In Re: Willamette View Associates, Inc.* 383-04295 (U.S. District, Bankruptcy, Portland, OR) 12-28-83 | | Pettibon sues to have WVA, Inc., involuntarily declared bankrupt. |
| Pettibon 4 | *Pettibon v. Beeson* 84-2-00626-2 (Clark) 3-19-84 | | Same as *Pettibon 2,* except asks for $35,000 in attorney fees. |
| Pettibon 5 | *Pettibon v. Beeson & Ratoza* A8404-02603 (Multnomah) 4-30-84 | | Pettibon sues Beeson and Ratoza for damages for breach of fiduciary duty, legal negligence, negligent entrustment, breach of contract, and interference with actual and prospective advantage relating to the sale of partnership assets in Hawaii. Pettibon also requests an accounting and winding up of the partnership. |
| Bank 1** | *Bank of Oregon v. Beeson, Pettibon et al.* 84-8-142 (Clackamas) 8-10-84 | | The Bank of Oregon sues to foreclose on the underlying mortgage on the Willamette Smith Clinic for failure to make payments. |
| Bank 2** | *First Interstate Bank v. Beeson & Pettibon* A8408-04870 (Multnomah) 8-21-84 | | First Interstate Bank sues Pettibon and Beeson on a promissory note for $100,000, to foreclose on a security agreement on fixtures in Hawaii, and to foreclose on Portland clinics and the T-V Highway property. |

| | | |
|---|---|---|
| Pettibon 6 | *WVA, Inc. & Pettibon v. Lord and Beeson* 84-1102C (Washington) 9-17-84 | Pettibon brings a stock-holder derivative action against Lord and Beeson for fraud, negligence, breach of fiduciary duty, and breach of contract and requests an accounting and dissolution of WVA, Inc. |
| Notdurft 1 ** | *Notdurft v. Pettibon, Beeson & Lord* 84-10-214 (Clackamas) 10-17-84 | Notdurft sues for strict foreclosure of a real estate contract concerning Clackamas County real property. |
| Pettibon 7 | *Pettibon v. Lord & Beeson* 85-0192C (Washington) 2-19-85 | Pettibon seeks a dec-laratory judgment and injunctive relief, on the grounds that a corporate resolution executed on 5-31-84 provided that defendants would forebear execution on judgments in *Beeson 1* for $15,212 and *Pettibon 3* for $2,200, and that Beeson had repudiated that agreement by notifying Pettibon of his intent to proceed to execution by way of garnishment or attachment. |
| Pettibon 8 | *Pettibon v. Beeson & Lord* A8505-02824 (Multnomah) 5-6-85 | Same as *Pettibon 7.* |
| Grabhorn 1 | *Grabhorn v. Pettibon, Beeson & WVA, Inc.* 85-0684C | Grabhorn sues to recover rent on T-V Highway property. |

** Pettibon filed cross-claims.

|  |  |  |
|---|---|---|
| | (Washington)<br>6-5-85 | |
| Pettibon 9 | *Pettibon v. Beeson*<br>A8507-04759<br>(Multnomah)<br>7-17-85 | Pettibon sues Beeson for note due ($218,769), foreclosure, and partition on Beeson's S.W. 13th Avenue clinic. |
| Pettibon 10 | *Pettibon v. Ratoza*<br>A8507-04759<br>(Multnomah)<br>7-31-85 | Pettibon sues Ratoza for legal negligence. |
| Pettibon 11 | *Pettibon v. Beeson & U.S. Creditcorp*<br>85-0957C<br>(Washington)<br>8-1-85 | Pettibon sues Beeson and U.S. Creditcorp for fraud, negligent misrepresentation, money had and received, breach of fiduciary duty, and rescission. |
| Pettibon 12 | *Pettibon & WVA, Inc. v. Lord & Beeson*<br>A8509-05830<br>(Multnomah)<br>9-18-85 | Same as *Pettibon 6* (venue changed to Multnomah). |
| Pettibon 13 | *Pettibon v. Beeson & Lord*<br>85-11-312<br>(Clackamas)<br>11-29-85 | Pettibon sues for partnership dissolution and and accounting of Willamette Associates, note due ($25,750), and partition of real property located in Clackamas County. |
| Beeson 3 | *Beeson v. Pettibon*<br>A8609-05459<br>(Multnomah)<br>9-9-86 | Beeson sues to recover $11,000 principal and $7,030 interest on a note executed on 9-4-80, guaranteed by Pettibon. |
| Pettibon 14 | *American Chiropractic Clinic v. Beeson*<br>87-101 RE | Pettibon sues Beeson for interference with actual and prospective |

| | | |
|---|---|---|
| | (U.S. District, Portland, OR) 1-30-87 | advantage, defamation, and unlawful trade practices. |
| Pettibon 15 | *Pettibon v. Beeson* A8703-01765 (Multnomah) 3-18-87 | Pettibon seeks damages from Beeson as managing general partner of the Willamette View Chiropractic Center partnership, for breach of fiduciary duty, and negligence. Pettibon also seeks a partner- ship dissolution and accounting. |

**UNIS, J.,** concurring in part and concurring in the sanction.

The majority holds that the misdemeanor assault committed by the accused while he was intoxicated in 1983 — over seven and one-half years ago — is professional misconduct in violation of DR 1-102(A)(2) because it "reflects adversely on his fitness to practice law." I disagree. Nevertheless, I concur in the sanction imposed by the court, and join all of the majority's opinion except that portion of Part III relating to DR 1-102(A)(2).

DR 1-102(A)(2) provides that "[i]t is professional misconduct for a lawyer to * * * [c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law." In this case, the sole focus of our inquiry is the phrase "fitness to practice law."

Many kinds of criminal conduct reflect adversely on fitness to practice law. Offenses such as fraud, embezzlement, and wilful failure to file income tax returns are illustrative. Some criminal offenses, however, do not implicate fitness to practice law. DR 1-102(A)(2) does not suggest, nor does the majority hold, that lawyers should be disciplined for all forms of criminal conduct. *See* 311 Or at 589. As the majority states, "[f]or example, a misdemeanor assault arising from a private dispute would not, in and of itself, violate [DR 1-102(A)(2)]." 311 Or at 589.

Thus, although a lawyer is *personally* answerable to the entire criminal law, a lawyer is *professionally* answerable only for criminal offenses that indicate *lack of those characteristics relevant to law practice.*

"Fitness to practice law," as that phrase has meaning in the context of DR 1-102(A)(2), refers to those characteristics relevant to law practice. It obviously includes more than technical legal skills. It encompasses respect for the legal process and "good moral character," which is defined as "those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility." *In re Taylor,* 293 Or 285, 288 n 2, 647 P2d 462 (1982) (quoting *Schware v. Board of Bar Examiners,* 353 US 232, 247, 77 S Ct 752, 1 L Ed 2d 796 (1957) (Frankfurter, J., concurring)).

In assessing whether to discipline a lawyer under DR 1-102(A)(2) for criminal conduct, the court should construe the criminal conduct provision of DR 1-102(A)(2), in my view, very much like the "good moral character" requirement for bar applicants in BR 7.5[1] and ORS 9.220(2)(b).[2] The fitness assessments of admitted lawyers through the disciplinary proceedings and the fitness assessments made of applicants through the good moral character requirement should be in harmony.[3] "Fundamentally, the question involved in both situations is the same — is the applicant for admission or the attorney sought to be disciplined a fit and proper person to be permitted to practice law * * *." *Hallinan v. Committee of Bar Examiners,* 65 Cal 2d 447, 55 Cal Rptr 228, 421 P2d 76, 81 (1966). The "fitness to practice law" requirement in the disciplinary rule and the "good moral character" requirement for bar admissions are designed principally to protect the public from unethical lawyers who victimize them or abuse the legal process. It is important to protect the public equally from experienced unfit lawyers and from new unfit lawyers.

In *In re Fine,* 303 Or 314, 317, 736 P2d 183 (1987), this court recognized that "[t]he statutory and administrative rules for admission to practice law in Oregon conform to the constitutional standard established by *Schware [v. Board of Bar Examiners, supra]*." In *Schware,* the Supreme Court of the United

---

[1] BR 7.5 requires that a bar applicant establish by clear and convincing evidence that he or she has the requisite good moral character and general fitness to practice law, and that his or her admission to the practice of law in this state will not be detrimental to the administration of justice or the public interest.

[2] ORS 9.220(2)(b) provides:

"[T]he lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and nation. *The conduct or acts in question should be rationally connected to the applicant's fitness to practice law.*" (Emphasis supplied.)

" 'Moral turpitude' * * * imports an act of baseness, vileness or depravity in the duties which one person owes to another or to society in general which is contrary to the usual, accepted and customary rule of right and duty which a person should follow." ABA Model Code of Professional Responsibility Canon 1 n 13 (1986); *Maryland Attorney Grievance Commission v. Walman,* 280 Md 453, 459, 374 A2d 354, 358 (1977).

[3] The court should be guided by the treatment afforded bar applicants who engage in similar misconduct. *See In re Jaffee,* 311 Or 159, 806 P2d 685 (1991) (the Board of Bar Examiners should use this court's prior disciplinary cases resulting in disbarment as a guide in assessing present moral character in admission cases).

States held that the good moral character requirement for admission to the Bar is constitutionally permissible as long as pre-admission conduct which is the basis for denying bar admission has a "rational connection with the applicant's fitness or capacity to practice law." 353 US at 239. In *In re Fine, supra,* this court said that evidence of past acts or conduct may be relevant to the issue of whether a bar applicant is presently of good moral character "if rationally connected to [the] applicant's fitness to practice law." 303 Or at 317.

Deciding whether particular criminal conduct is rationally connected with a lawyer's or bar applicant's fitness to practice law, however, can be difficult. It is a fact-specific inquiry. The concepts of "fitness to practice law" and "good moral character" are phrases that defy precise definition. The nature and gravity of the criminal act, the motivation of the lawyer or applicant in committing the crime, and the circumstances surrounding the crime are relevant considerations.

If admitted lawyers and bar applicants are treated similarly, then it follows that if a past criminal offense committed by a bar applicant would not, of itself, preclude a finding of present good moral character, the same act if committed by an admitted lawyer should not, of itself, establish present unfitness to practice law. Conversely, if a past criminal act committed by an applicant would, of itself, establish lack of good moral character, the same misconduct if committed by an admitted lawyer should, of itself, establish present unfitness to practice law.

Turning now to the present case, I do not believe that the 1983 misdemeanor assault is a criminal act that reflects adversely on the accused's "fitness to practice law," as that catch-all phrase has meaning in the context of DR 1-102(A)(2). The assault, standing alone, does not indicate lack of those characteristics relevant to the practice of law. If committed by a bar applicant, it would not, of itself, preclude a finding of good moral character. The assault was an isolated incident, not involving a fixed pattern of misbehavior, and did not involve moral turpitude. There is nothing in the record that suggests that the assault is symptomatic of the accused's character and behavior. The assault was committed while the accused was intoxicated; it was committed while the accused's faculties and good judgment were unquestionably impaired. The accused, of

course, was personally answerable to the criminal law and the civil law for his misconduct. He should not, however, be held professionally answerable for the misdemeanor assault, because there is no rational connection between that isolated, dated offense and his fitness to practice law.

For the foregoing reasons, I join all of the majority's opinion except that portion of Part III relating to DR 1-102 (A)(2). I concur in the sanction imposed by the majority.